PER CURIAM:
 

 Appellant Marathon Oil Company, a trade creditor of debtor Craig Oil Co., brings this appeal from a district court order avoiding as preferences certain payments made by Craig to Marathon. Appel-lee William Flatau, bankruptcy trustee for Craig, successfully argued to both the bankruptcy and district courts that Craig’s payment of invoices totaling $127,098 for gasoline supplies should be returned to the debtor’s estate pursuant to 11 U.S.C. § 547(b).
 
 [1]
 
 31 B.R. 402 (Bkrtcy.M.Ga.1983). The parties stipulated that a preference had occurred within the meaning of that section, but appellant contended that Craig’s payments were nonetheless immune from appellee’s avoidance powers under 11 U.S.C. § 547(c)(2) as payments made in the ordinary course of business. The courts below rejected this defense, both finding that, given all the circumstances, Marathon had failed to prove all the elements of the ordinary course of business defense.
 

 Section 547(c)(2) provides that a debtor’s otherwise preferential payments may not be avoided if four conditions are satisfied. The payments must be (1) made as payment of debts incurred in the ordinary course of the debtor’s business; (2) made within forty-five days of incurring the
 
 *1565
 
 debts;
 
 [2]
 
 (3) made in the ordinary course of business between the debtor and the creditor; and (4) made according to ordinary business terms. The parties stipulated below that the first two requirements had been met: the underlying debts were incurred in the ordinary course of the debt- or’s wholesale and retail gasoline business, and the payments were made within the requisite forty-five day period. Thus, the only issue litigated below and contested on appeal is whether the bankruptcy court
 
 [3]
 
 erroneously concluded that appellant had failed to prove
 
 [4]
 
 the two remaining requirements: that the payments were made in the ordinary course of business between Craig and Marathon and were made according to their ordinary business terms. Resolution of these issues turns on the specific events surrounding Craig’s payments to Marathon.
 

 Until receivership proceedings in December, 1981, Craig Oil operated a wholesale and retail gasoline company in the Macon, Georgia area. Craig had relied upon Marathon, as well as several other companies, for gasoline supplies. Craig picked up the gas in its own trucks, was billed within a day or two for each pick-up and was then obligated under the supply agreement to pay Marathon within ten days of billing. Despite the terms of this agreement, Marathon did not consider any payment overdue unless it arrived more than sixteen days after billing. Throughout most of Craig’s dealings with Marathon, its payments were generally on time.
 

 In August, 1981, Craig experienced severe cash flow problems and one of its trade creditors, Southern Petroleum, sought to force the company into bankruptcy proceedings. Southern Petroleum invited Marathon to join in an involuntary petition, but Marathon declined because Craig’s payments were still on time. Nonetheless, Marathon’s regional credit manager telephoned Craig on August 14 and asked for “a show of good faith,” suggesting payment by wire transfer. Thereafter, Craig paid Marathon with cashier’s checks rather than the corporate cheeks it had previously used. Craig made fourteen payments in this manner, continuing to show its “good faith” even after it had ceased buying gasoline from Marathon on August 27 and had closed its retail operations in the Macon area. After bankruptcy proceedings were instituted, the trustee sought to avoid all payments made by cashier’s check.
 

 Marathon sought to prove that despite the change from corporate to cashier’s checks, all of Craig’s payments were made in the ordinary course of their business dealings and according to their ordinary terms. The bankruptcy court agreed that a cashier’s check “in and of itself” did not render the payments out of the ordinary course, but it concluded that “in the context of the circumstances of this case,” the payments could not be protected under § 547(c)(2). The bankruptcy court focused particularly on the facts that Marathon almost never received cashier’s checks and Craig seldom used them, that Marathon had little need for Craig’s good faith since Craig stopped buying gas about two weeks after Marathon’s “suggestion” and that Marathon’s phone call was the sole reason for Craig’s change in payment. The bankruptcy court ultimately found that the payments were out of the ordinary course because Craig switched to cashier’s checks and continued to pay in full to prevent
 
 *1566
 
 Marathon from joining in an involuntary petition or seeking payment from Craig’s guarantors. The district court affirmed.
 

 Marathon claims error in the bankruptcy court decision by arguing that the debtor’s intent in making payments is irrelevant to whether the payments are made in the ordinary course of business. In support, Marathon cites the fundamental change in preference law wrought by the Bankruptcy Act of 1978. Prior to the new act, payment was preferential only when the creditor had reasonable cause to believe the debtor was insolvent at the time of payment.
 
 See
 
 11 U.S.C. § 96(b) (repealed). The new statute defines preference solely
 
 [5]
 
 with respect to a payment’s effect on the size of the debtor’s estate.
 
 See
 
 11 U.S.C. § 547(b) (preference occurs when a creditor receives more than he would have in bankruptcy proceedings). Marathon correctly concludes that a creditor’s state of mind is now immaterial in finding a preference. In making this argument, Marathon slides away from the issue in the case — which is not whether there was a preference, but whether the preferred transfer was in the ordinary course of business between Marathon and Craig and whether the payments were made according to ordinary business terms. Conceptually, it is difficult to disentangle these legal propositions and the facts which go to prove three separate statutory sections. It does not follow from the above that a
 
 debtor’s
 
 state of mind or motivation is likewise immaterial in applying the preference
 
 exception
 
 of § 547(c)(2).
 

 In describing the ordinary course of business exception, Congress stated that
 

 its purpose is to leave undisturbed normal financial relations, because [such an exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditor during the debtor’s slide into bankruptcy.
 

 H.R.Rep. No. 595, 95th Cong., 1st Sess. 373-74 (1977),
 
 reprinted in
 
 1978 U.S.Code Cong. & Ad.News 5787, 6329. It seems clear from this statement that § 547(c)(2) should protect those payments which do not result from “unusual” debt collection or payment practices. To the extent an otherwise “normal” payment occurs in response to such practices, it is without the scope of § 547(c)(2). Thus, whenever the bankruptcy court receives evidence of unusual collection efforts, it must consider whether the debtor’s payment was in fact a response to those efforts. Consequently we find no error in the lower court’s consideration of Craig’s motive for continued payment to Marathon, in light of Marathon’s request for a showing of “good faith,” the desire of Craig to forestall a creditors’ petition, and the existence of the guaranty agreement by the terms of which Craig’s owner and his wife were personal obligors of the debt owed Marathon in the event of the corporation’s default. This state of mind alone cannot establish “unusual” or “extraordinary” action by the debtor. It merely goes to explain the unusual payment actions by the debtor in this case.
 

 In addition, we find no error in the bankruptcy court’s ultimate conclusion that Craig’s payments were out of the ordinary course of business and not according to ordinary business terms. The record indicates that during the time at issue, Craig made all its payments to Marathon by cashier’s rather than corporate checks. Until Marathon called on August 14, 1981, Craig had not made any payments to anyone by cashier’s check during that fiscal year beginning in December, 1980.
 
 [6]
 
 In fact, less than ten percent of Craig’s disbursements during August, 1981, were made by cashier’s cheek; that percentage rose to only twenty percent during the following month. It seems clear then that cashier’s checks
 
 *1567
 
 were not Craig’s typical form of payment, either before or after Marathon’s phone call, yet Marathon received fourteen consecutive cashier’s checks.
 
 [7]
 

 The use of cashier’s checks to show good faith is especially peculiar here since Craig soon stopped purchasing gasoline from Marathon and closed down a portion of its operations in Macon. Some courts have been more likely to find payments outside the ordinary course if they are made after a business has ceased operations.
 
 See In re Penninsula Roofing & Sheet Metal, Inc.,
 
 9 B.R. 257, 261 (Bkrtcy.N.D.Mich.1981) (not in ordinary course since “business was closed, insolvent and attempting to dissolve”);
 
 Cf. Kallen v. Litas,
 
 47 B.R. 977 (Bkrtcy.N.D.Ill.1985) (not in ordinary course because services rendered after business destroyed by fire).
 
 But see In re Ferguson,
 
 41 B.R. 118 (Bkrtcy.E.D.Va.1984) (payment in ordinary course even though farmer was closing his business). While we concur that dissolution of the business may be relevant in determining what constitutes the ordinary course of business, we do not conclude that factor alone controls this case. Craig had closed only its retail operations in August, 1981, and as late as November, 1981 sought to continue its wholesale business through a Chapter XI reorganization. Thus, the status of payments made in August and September cannot be determined with reference to events occurring some three months later.
 

 Of considerable significance is the fact that most of these checks were late payments. The parties’ agreement provided that purchases were net ten days, but Marathon established that it considered as timely any payment made within sixteen days of invoice. Nonetheless, eight of the disputed payments were late even with regard to the parties’ course of dealings.
 

 Lateness is particularly relevant in determining whether payments should be protected by the ordinary course of business exception. As several courts have noted, this exception is directed primarily to ordinary trade credit transactions. These typically involve some extension of credit but are meant to be paid in full within a single billing cycle.
 
 [8]
 

 See, e.g., Barash v. Public Finance Corp.,
 
 658 F.2d 504, 511 (7th Cir.1981) (citing Levin,
 
 An Introduction to the Trustee’s Avoiding Powers,
 
 53 Am.Bankr.L.J. 173 (1979));
 
 In re Kennesaw Mint, Inc.,
 
 32 B.R. 799 (Bkrtcy.N.D.Ga.1983);
 
 In re Penninsula Roofing, supra.
 
 Because the credit extended is meant to be extremely short-term, Congress likened payment of trade credit to payment of current expenses. Recognizing that the latter had traditionally been protected from avoidance in bankruptcy,
 
 [9]
 
 Congress extended the same protection to trade credit through the ordinary course of business provision.
 
 See Barash, supra
 
 (§ 547(c)(2) codifies the “current expense rule” employed under the Code; ordinary course of business is a variant of the contemporaneous exchange exception of § 547(c)(1)). Since the foundation of this provision is the similarity of trade credit and current expenses, the scope of its protection is necessarily limited to trade credit which is “kept current” or other transactions which are paid in full within the initial billing cycle. Thus, untimely payments are
 
 *1568
 
 more likely to be considered outside the ordinary course of business and avoidable as preferences.
 

 Indeed, several recent cases have distinguished lateness as an important factor in finding payments outside the ordinary course. In
 
 In re Gold Coast Seed Co.,
 
 24 B.R. 595, 597 (Bkrtcy. 9th Cir.1982), the Ninth Circuit Bankruptcy Appellate Panel found that untimeliness “in particular” placed the payment outside the ordinary course “as a matter of law.” The Bankruptcy Court of Minnesota has likewise held that overdue payments are not in the ordinary course.
 
 See In re Ewald Bros. Inc.,
 
 45 B.R. 52, 59 (Bkrtcy.D.Minn.1984).
 
 [10]
 
 In contrast, the bankruptcy court in
 
 In re Mindy’s, Inc.,
 
 17 B.R. 177 (Bkrtcy.S.D.Ohio 1982), found certain apparently late rental payments to have been made in the ordinary course because they were in fact timely in view of the parties’ prior dealings. Here, the majority of payments were late and the bankruptcy court correctly relied upon that fact in determining the payments were outside the ordinary course of business.
 

 In view of all the circumstances surrounding the disputed payments, including the facts that the debtor had not previously paid by cashier’s check, that a significant number of the payments were overdue, that payments were made after Craig stopped buying from Marathon and after its retail operation in Macon was closed, that continued payment was induced by the creditor’s request for assurance of payment and that another creditor was attempting 'to push the debtor into bankruptcy, we conclude that such payments were not made in the ordinary course of business or according to ordinary business terms. Consequently, we affirm the bankruptcy court’s denial of § 547(c)(2) protection to these payments.
 

 AFFIRMED.
 

 [1]
 

 . 11 U.S.C. § 547(b) enables the trustee to avoid as preferential, transfers made under the following conditions:
 

 (1) to or for the benefit of a creditor;
 

 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 

 (3) made while the debtor was insolvent;
 

 (4) made—
 

 (A)on or within 90 days before the date of the filing of the petition; or
 

 (B)between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;
 

 (5)that enables such creditor to receive more than such creditor would receive if—
 

 (A) the case were a case under chapter 7 of this title;
 

 (B) the transfer had not been made; and
 

 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
 

 [2]
 

 . Congress eliminated the forty-five day requirement by amendment in 1984.
 
 See
 
 Pub.L. No. 98-353, 98 Stat. 333.
 

 [3]
 

 . Despite appellee's contentions to the contrary, this court's review is directed to whether the bankruptcy court’s findings of fact were clearly erroneous. This necessarily follows from the district court's affirmance of those findings.
 
 See Birmingham Trust Nat’l Bank v. Case, 755
 
 F.2d 1474, 1476 (11th Cir.1985).
 

 [4]
 

 .Section 547(g) now provides that "the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.” Since the exceptions under subsection (c) are by way of affirmative defense to a trustee’s petition seeking a preference, this amendment merely codified existing procedure.
 

 [5]
 

 . This assumes, of course, that the payment satisfies the other four criteria set out in note 1,
 
 supra
 
 (§ 547(b)(l)-(4)).
 

 [6]
 

 . Corporate checks were employed even during January and February, 1981, when Craig’s payments to Marathon became so late that Marathon temporarily cut off supplies to Craig.
 

 [7]
 

 . We also find significant the fact that Marathon seldom received cashier’s checks. Only about 1 percent of its trade purchasers paid by cashier's check. Such payment was limited to those customers who had bounced checks, had dramatically increased their purchases, had always paid by certified funds, or purchased in large volume barge accounts.
 

 [8]
 

 . It was for this reason that Congress originally required payment within forty-five days of incurring the obligation. This period represents a normal trade cycle.
 
 See Barash, supra
 
 at 511.
 

 [9]
 

 .Courts interpreting the former Bankruptcy Code implied an exception for payment of regular business expenses within the preference period, based on the notion that current expenses were not antecedent debts.
 
 See Barash, supra
 
 at 510.
 

 [10]
 

 . Note that timeliness was strictly construed in both cases: the avoided payments were overdue by seven days or less.
 
 See Gold Coast, supra
 
 (overdue "almost a week”);
 
 Ewald Bros., supra
 
 (two payments overdue five and seven days respectively).