In re SPW CORPORATION, Republic Contractors, Inc., Sharpe Mechanical, Inc., Wallace P & I Companies, Inc., Wallace Power & Industrial Co., Inc., Wallace Constructors, Inc., Sam P. Wallace Company, Inc., Brown–Olds Corporation, Sam P. Wallace Company of Louisiana, Inc., Elmwood Sheet Metal, Inc., Wallace International, Ltd., Sam P. Wallace Overseas Corporation, and Sam P. Wallace De Centro America, S.A., Debtors.

ESTATE OF SPW CORPORATION (formerly Dale L. McCullough, Trustee), Plaintiff,

v.

A.P.V. EQUIPMENT, INC., et al, and including D–FW Supply Company, Inc., Defendants.

Bankruptcy No. 385–31198 RCM–11. Adv. No. 387–8000.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Jan. 5, 1989.

See also, Bkrtcy., 96 B.R. 683.

---

E. P. Keiffer, Dallas, Tex., for plaintiff.

Martin Lowy, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

ROBERT McGUIRE, Chief Judge.

This is a preference action tried November 7, 1988, involving issues under § 547(c)(2), the ordinary course of business exception. The following constitutes the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052. The parties stipulated to the following facts.

### A. *Stipulation of Fact*

1. Sam P. Wallace Company, Inc. ("SPW Co.") was a merit subcontractor which performed the mechanical requirements on major commercial property developments. Such requirements generally included the plumbing, heating, ventilation and air conditioning.

2. D–FW Supply Company, Inc. ("D–FW Supply") was and is a supplier of pipes, fittings, and other materials used in the construction of fire control systems for commercial projects, and had supplied such materials to SPW Co. from before 1983 until and through April, 1985, and post-petition.

3. Invoice # 50285 from D–FW Supply is the only invoice at issue in this action. It reflects the following information:

 a. 11/27/84 was the invoice and shipping date for $16,650.28 worth of parts and materials supplied to SPW Co. The shipping date is the date the obligation to pay is incurred.

 b. The terms for payment as printed on the invoice are "10th Prox, No cash discount allowed" and "This invoice is due and payable in Dallas, Dallas County, Texas. Maximum legal interest rate will be charged if not paid 30 days after invoice date."

 c. The 30th day following invoices was December 27, 1984. No interest was charged on this invoice.

 d. The items described in the invoice were delivered and accepted.

4. By Check No. 46853, SPW Co. paid D–FW Supply the sum of $16,592.78 and designated that the payment was for invoice No. 50285. The check was dated 2/19/85. It was delivered and deposited by D–FW Supply on February 25, 1985. The total number of days from shipment to delivery and deposit was ninety days.

5. The parties' dealings between themselves encompassed invoices which were generally paid within 45 to 75 days from their date. The average number of days elapsed from invoice to payment was sixty days. These figures, as between the parties, are consistent with the standards in the industry as a whole.

6. D–FW Supply supplied material to the Debtors during the ninety day preference period on the same basis as it had before the ninety day period. None of the time frames from shipment to payment, which, in any way, fall into this ninety day time frame, are used to calculate the range or the average stated in No. 5 above.

7. The account between the parties was never reduced to zero. The account is an open account, however, all payments by SPW Co. designated which invoices were

paid. D–FW Supply abided by and credited the account according to such designations. A balance remains due to D–FW Supply.

8. No unusual collection measures or pressures were applied by D–FW Supply to obtain payment of the invoice at issue in this action. No notices of intent to claim a lien or lien notices were filed by D–FW Supply to obtain payment of the invoice at issue in this action.

The parties further stipulated that SPW Co. has proven all the elements required to recover a preference under § 547(b). Debtor filed bankruptcy on May 6, 1985.

The parties submitted their case on affidavits and stipulated that the Court could treat the affidavits as live testimony, *i.e.*, with determinations of credibility, etc.

Jerome James, president of D–FW Supply ("James"), prepared exhibits A and B to his affidavit.

Exhibit A to the James affidavit is a summary of all invoices from D–FW Supply paid by SPW Co. during the period from January, 1984, through and including January, 1985, immediately prior to the payments at issue in this action. Exhibit A reflects the shipping and invoicing dates as shown on D–FW Supply's file copies of the invoices, and the amounts paid and dates of deposit as shown on D–FW Supply's file copies of SPW Co.'s check stubs. Exhibit A includes a total of 327 invoices, on which total payments of $600,635.02 were made by SPW Co. The average number of days between the date of shipment and date of payment for all of the invoices shown on Exhibit A is 67.5 days.

Exhibit B to the James affidavit is a sub-summary of the invoices listed on Exhibit A which includes only those invoices paid seventy-five or more days after the date of shipment reflected on the invoices. Exhibit B includes 102 invoices on which SPW Co. paid a total of $124,388.28.

SPW sought to recover $16,592 as a preferential transfer pursuant to 11 U.S.C. § 547. Since the parties stipulated that the elements of § 547(b) have been satisfied, the only remaining issue for the court to decide involves whether the transfer by SPW to Carrier falls within the "ordinary course of business" exception, contained in 11 U.S.C. § 547(c)(2)(A–C).

In order to satisfy this exception to recovery of a preferential transfer, a defendant bears the burden of proof to meet the three part test. See 11 U.S.C. § 547(g). First, a defendant must show the debt was incurred in the ordinary course of business. See 11 U.S.C. § 547(c)(2)(A). In this case the parties have stipulated that this condition has been met. Second, a defendant must prove the transfer was "made in the ordinary course of business or financial affairs of the debtor." See 11 U.S.C. § 547(c)(2)(B). Finally, the creditor must show that the payment was made "according to ordinary business terms". See 11 U.S.C. § 547(c)(2)(C).

In determining whether a transaction is made in the ordinary course of business and according to ordinary business terms, courts have generally taken two approaches. The court, in *In Re Steel Improvement Co.*, 79 B.R. 681 (Bankr.E.D. Mich.1987), offers a good comparison of the two views.

> A majority of the decisions have confined their inquiry to whether the manner and timing of the late payments at issue were consistent with the manner and timing of previous payments made by the debtor in its course of dealings with the creditor.
>
> \* \* \* \* \* \*
>
> A minority of decisions recognize a significant distinction between the requirements of subparagraphs (B) and (C) of Section 547(c)(2) and hold that the late payments at issue must meet *both* requirements in order for the "ordinary course of business" exception to apply.

*Id.* at 683–684. (Emphasis added). In other words, under the first approach, courts only look at the parties' prior dealings. In contrast, the second view requires that a court examine the industry standards in addition to the parties' prior dealings.

In determining which approach to apply, the Court notes that several Circuit courts have considered issues involving the ordinary course of business exception. See *In*

re Continental Commodities, 841 F.2d 527 (4th Cir.1988); WJM, Inc. v. Massachusetts Dept. of Welfare, 840 F.2d 996 (1st Cir. 1988); Matter of Xonics Imaging, Inc., 837 F.2d 763 (7th Cir.1988); In re White River Corp., 799 F.2d 631 (10th Cir.1986); In re Craig Oil, 785 F.2d 1563 (11th Cir.1986). Although SPW argues that four Circuits have adopted the minority view, an examination of the cases reveals that the issue is not as clear cut as SPW contends. Only one of the decisions discusses and applies as a separate test "ordinary business terms" by finding that late payments are outside the meaning of this phrase. See Craig Oil, 785 F.2d at 1563. Only one of the decisions discuss the split of authority in the area. See Xonics, 837 F.2d at 766. However, even the Xonics court does not choose which path to follow because the parties stipulated that the transfer was according to ordinary business terms. In another case, the Tenth Circuit holds that subpart (C) is satisfied without discussing the conflicting interpretations of the phrase. In re White River, 799 F.2d at 631. In Continental Commodities, the Bankruptcy Court finds the "ordinary business term" condition is satisfied but the Seventh Circuit never discusses the issue. 841 F.2d at 527. Finally, the First Circuit holds that the ordinary course of business exception consists of "three distinct elements", however they find that the transfer in question is not "ordinary" under 547(c)(2)(B) thus never reaching the issue of ordinary business terms. WJM, 840 F.2d at 1010.

Turning to the language of the statute, the court finds the inclusion of subpart (C) into the Code significant. The legislative history provides little guidance. The purpose of the ordinary course of business exception is to "leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 373 (1977), reprinted in 5 U.S.Code Cong. & Admin.News 5787, 6329 (1978) (the "House Report"). The Eleventh Circuit has also delved into the purpose of the ordinary course of business exception.

... this exception is directed primarily to ordinary trade credit transactions. These typically involve some extension of credit but are meant to be paid in full within a single billing cycle. [citations omitted]. Because the credit extended is meant to be extremely short-term, Congress likened payment of trade credit to payment of current expenses.... Since the foundation of this provision is the similarity of trade credit and current expenses, the scope of its protection is necessarily limited to trade credit which is 'kept current' or other transactions which are paid in full within the initial billing cycle.

In re Craig Oil Co., 785 F.2d at 1567, citing among others, Barash v. Public Finance Corp., 658 F.2d 504, 511 (7th Cir. 1981), cf., In re Air One, Inc., 80 B.R. 145, 147–48 (Bankr.E.D.Mo.1987), In re Southern Commodity Corp., 78 B.R. 626, 628 (Bankr.S.D.Fla.1987). Also see, 2 Norton Bankruptcy Law & Practice, § 32.19 (1988) and In re Bourgeois, 58 B.R. 657 (Bankr.W.D.La.1986). In DeSimone, Section 547(c)(2) of the Bankruptcy Code: The Ordinary Course of Business Exception Without the 45 Day Rule, 20 Akron Law Review 95 (1986) ("DeSimone Article"), it is stated:

The main policy behind the ordinary course exception is to prevent preference laws from disturbing normal financial relations. This makes sense when one considers that the purpose of preference law is to discourage unusual action on the eve of bankruptcy that interferes with the bankruptcy distribution. Ordinary course transactions do not do this and, in fact, uphold the preference/bankruptcy policy of avoiding bankruptcy in the first place. If preference law applied to pre-bankruptcy ordinary course of business transactions, few creditors would extend credit to troubled debtors; and without credit, few troubled debtors could continue in business. Section 547(c)(2) encourages creditors to extend credit to financially troubled debtors. It strikes a bal-

ance between the need to discourage unusual action and the troubled debtor's need to receive credit in order to continue in business and, hopefully, turn his troubles around.

*Id.* at 100.

Other courts have found the inclusion of subpart (C) into the Code a significant consideration in their adoption of the minority approach. As the *Steel Improvement* court notes "[t]he difficulty with the majority approach is that either it ignores subparagraph (C) of Section 547(c)(2) and thereby makes it a nullity, or it interprets subparagraph (C) to require the same showing as subparagraph (B) and thereby makes it superfluous." *Steel Improvement*, 79 B.R. at 684. In the absence of legislative intent to the contrary, the Court gives the language in subpart (C) effect and considers the industry standards as a part of the inquiry of whether a transaction was in the ordinary course of business. Accordingly, the Court will consider the standard in the industry as well as the parties' course of dealing to determine whether the transfer comes within the ordinary course of business exception under section 547(c)(2). "The fact that a long overdue payment is ordinary between the parties does not mean it is in the ordinary course of business within the meaning of the exception." *In re White*, 64 B.R. 843, 850 (Bankr.E.D.Tenn.1986).

In the DeSimone Article, it is stated:

It seems clear that late payments should not be considered 'ordinary course' when the debtor normally pays on time. But what if the debtor has established a practice of paying several days (or weeks) after the due date? The court in *Ewald* hinted, in dicta, that it might be possible to prove that the debtor had established a practice of making late payments. But it is hard to argue that such a practice is according to ordinary business terms. The 547(c)(2)(C) requirement was, no doubt, put in to prevent protection when the terms of payment, though normal for the parties are not accepted practices for most businesses. Regularly accepting late payments is not normal for most businesses and not the kind of conduct Congress intended 547(c)(2) to protect. However, requiring payment exactly on the due date is too much; payments that are made within one or two days of the due date should be protected whether or not the debtor had an established practice of making payment one or two days late. This is not the kind of 'unusual conduct' that Congress intended to be excluded from 547(c)(2) protection.

20 Akron Law Review at 117. DeSimone continues the analysis by stating:

The first step is to decide whether each ordinary course requirement provides a subjective standard, an objective standard, or both an objective and a subjective standard, against which to measure the transaction in question. There is little doubt that Congress intended for potential 547(c)(2) transfers to be judged both objectively and subjectively. It would be difficult to 'preserve normal financial relations' without relying primarily on the parties' past conduct. Of course, some transactions clearly were not intended to receive 547(c)(2) protection, no matter how ordinary they are to the parties. Thus, an objective standard is also needed. The question is: What standard does each element require?

The court in *In re Production Steel* felt that 547(c)(2)(B) provides a subjective standard, while 547(c)(2)(C) provides an objective standard. Section 547(c)(2)(B) states that the payment must be made in the 'ordinary course of business *of the debtor and the transferee [i.e., creditor]*. Given its focus on the *parties'* course of business, it is proper to consider it as setting out a subjective test. In contrast, the failure of section 547(c)(2)(C) to mention the parties when it speaks of ordinary business terms indicates that it is an objective standard. It could be argued that section 547(c)(2)(C) contains both an objective and a subjective element. However, the parties' 'ordinary business terms' are easily included within their 'ordinary course of business or financial affairs.' Any further distinction is unnecessary; having one

element focus subjectively on the transfer, while the other looks at it objectively is less confusing and leads to a clearer analysis.

*Id.* at 123–24.

■ In considering which transactions are "ordinary", courts generally look at several factors including the timing, the amount and manner a transaction was paid and the circumstances under which the transfer was made. *In re First Software Corp.*, 81 B.R. 211 (Bankr.D.Mass.1988); *In re White*, 58 B.R. 266 (Bankr.E.D.Tenn. 1986); *Matter of Ullman*, 80 B.R. 101 (Bankr.S.D.Ohio 1987). Since the parties do not appear to be contesting the issues of manner, amount and circumstances under which a debt was paid, the Court will turn to the timing of this transaction as compared with the timing of prior transactions between SPW Co. and D–FW Supply. This particular check was dated February 19, 1985, approximately eighty-four days after the invoice date of November 27, 1984. The check was delivered and paid on February 25, 1985, approximately ninety days after the invoice date.

Turning to the transactions between SPW Co. and D–FW Supply, the parties have stipulated that the average time between the invoice date and the date of payment is sixty days. The parties have also stipulated that the invoices were generally paid within forty-five to seventy-five days. Even James states in his affidavit that SPW Co. normally paid D–FW Supply within forty-five to seventy-five days after the invoice date.

As one court noted "the cornerstone of this element [ordinary course of business] of a preference defense is that the creditor needs demonstrate some consistency with other business transactions between the debtor and the creditor." *In re Magic Circle Energy Corp.*, 64 B.R. 269, 273 (Bankr. W.D.Okla.1986) While the Court recognizes that consistency between the debtor's and creditor's transactions remains an important consideration in applying the ordinary course defense, the DeSimone Article

summarizes the problem facing the Court as follows:

The harder questions arise when the parties' previous dealings are not so exact. How much latitude should the court allow? In general, if the parties' past conduct varied, but had ascertainable, reasonable boundaries, then the court should consider any transaction that falls within those boundaries as ordinary. For example, assume that the debtor is an electrical contractor and the creditor is an electrical supply company. The debtor purchases supplies on credit as needed for each project he is working on. He pays for all supplies purchased for a project within two weeks of completion. Since some projects take only a few days and others may take months, the time between purchase and payment necessarily varies. Yet, any payment within two weeks of completing the project that the payment relates to should be considered ordinary.

DeSimone Article, *supra*, at 125–126.

The factual evidence presented to the Court indicates that this particular transaction fell within the range that could be called the ordinary course between parties. As one court held, "A transaction can be ordinary and still occur only occasionally." *In re Economy Milling Co., Inc.*, 37 B.R. 914, 922 (D.S.C.1983). *See also, Windsor Communications Group v. Freedom Greeting Card Co., Inc.*, 63 B.R. 770 (E.D. Penn.1986). Accordingly, the Court holds that the Defendant met its burden of proof under § 547(c)(2)(B).

The next issue is whether Defendant met its burden of proof under § 547(c)(2)(C), *i.e.*, was the transfer "made according to ordinary business terms."

James testified that D–FW Supply's customers, including SPW Co., were and are currently second and third tier building subcontractors whose ability to pay D–FW Supply's invoices depends on their receiving payment from their prime contractors for the work in which they incorporate D–FW Supply's materials, and that the aging of their invoices to D–FW will vary

according to the draw and payment schedules of the jobs on which they are working.

He further stated:

Invoices rendered by D–FW Supply Co., Inc. after the 20th or 25th day of any given month typically will not be included in the customer's draw request for that month, and accordingly will be aged an additional 25 to 30 days before payment.

James affidavit at 3. Since the invoice in question was dated November 27, 1984, then, allegedly, the invoice would not be included in SPW Co.'s December draw request. Also an examination of the transactions between the parties from November, 1983 through the beginning of 1985 reveals that approximately 20 of the 327 payments were paid over ninety days after the invoice date.

As stated, Exhibit B consists of 102 invoices that were paid seventy-five or more days after shipment. Out of the 102 checks on Exhibit B, fifty-four of same were billed on or after the twentieth of the month.

Debtor contends that, by Stipulated Fact No. 5, page 3 hereof, Defendant has admitted that this payment in question was not according to ordinary business terms. James' affidavit on billings on or after the twentieth of the month show, if credible, a possible generally recognized industry exception to the forty-five to seventy-five-day payment norm.

Debtor's representative, Donny Daniel ("Daniel"), in his affidavit of November 4, 1988, states as follows:

During my professional experience it is the known industry standard that sellers of plumbing parts and supplies to complete the heating, ventilating and air conditioning requirements of a commercial project expect payment within 35 to 75 days of the date of delivery to the purchasing subcontractors for the following reasons:

Once the plumbing parts and supplies are delivered to the job site it is billed to the general contractor as stored material or work completed.

It is standard for a subcontractor to be paid within 30 to 45 days of the billing to the general contractor. If an item is received for storage near the end of the billing cycle it may receive its funds as early as 30—45 days after shipment. If delivered at the beginning of the billing cycle the time frame for payment will be from 60—75 days after delivery.

In evaluating credibility of the Daniel November 4, 1988 affidavit, and for impeachment purposes only, the Court is permitted to examine the Court file for any possible prior Daniel affidavits contained in the file which might contain prior verified statements which might appear inconsistent in whole or in part.

On page 4 of an affidvit which Daniel signed on October 7, 1988 and filed in this same case on October 7, 1988, he stated that, depending on when an item is delivered, a supplier can expect to be paid anytime from thirty-five to seventy-five days after delivery; he further noted that payment in some circumstances may be made as late as ninety days after invoice, however, "such is not the norm but is known to occur with some degree of frequency". This quoted statement was not contained in the Daniel affidavit of November 4, 1988.

The Court finds that the foregoing James testimony is credible and that, since the invoice in question was dated November 27, 1984, the aging of the invoice for an additional twenty-five to thirty-five days before payment would constitute ordinary business terms. The Defendant met its burden of proof under § 547(c)(2)(C); the payment was made according to ordinary business terms.

In the DeSimone Article, it is stated at 123:

... But, the combination of several minor problems is usually enough to deny protection. In the final analysis, it is the quality, not the quantity, of the negative factors that should determine whether a

transaction receives section 547(c)(2) protection.

The Court further finds the following:

SPW Co. typically claimed a 2% discount on invoices paid within sixty days from date. D–FW Supply charged back such discounts on invoices not paid within thirty days from date by invoicing SPW Co. for unearned discounts in the month following receipt of the discounted payments.

D–FW Supply customers, including SPW Co., were not placed on credit hold unless and until their accounts were ninety days past due, and no special collection measures were taken on accounts less than ninety days past due.

The balance left open on SPW Co.'s account after the payment made on or about February 25, 1985, which is the subject of this action was in excess of $8,000.

There were no changes made in the credit terms extended to SPW Co. at any time prior to the filing of SPW Co.'s Chapter 11 proceedings.

Plaintiff contends (Pretrial Order, p. 5) that SPW Co. was a second tier subcontractor just below the original contractor. Daniel's affidavit did not establish the "tier".

Defendant contends (Pretrial Order, p. 4 and James affidavit, p. 3) that its customers, including Debtor, were and are "second and third tier" subcontractors. Debtor was either a second or third tier subcontractor.

Judgment will be entered for the Defendant.