**In re L. BEE FURNITURE CO., INC., Debtor.**

**Charles W. GRANT, Trustee, Plaintiff,**

v.

**SWINDAL–POWELL COMPANY, a Florida Corporation, Defendant.**

**Bankruptcy No. 96–1017–BKC–3P7. Adv. No. 96–254.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Jan. 15, 1997.

Ronald L. Bergwerk, Jacksonville, FL, for Plaintiff.

Harris L. Bonnette, Jr., Jacksonville, FL, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This proceeding came before the Court upon complaint to recover preferential transfers pursuant to 11 U.S.C. § 547(b). Upon the evidence presented at the trial held on September 18, 1996, the Court enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

L. Bee Furniture filed its petition for Chapter 7 relief on February 23, 1996. (Doc. 1). This Adversary Proceeding was filed on April 30, 1996. (Doc. 50).

Swindal–Powell Company, Inc. ("Defendant") is a wholesale furniture distributor located in Jacksonville, Florida and has been in business since 1923. (Tr. 1, 12, 17–21). Defendant supplied furniture to L. Bee Furniture Company, Inc. ("Debtor"), and the two have maintained a business relationship since the 1960's. (Tr. 8–23).

Mr. David F. Cook, the Treasurer and Secretary of Swindal–Powell, testified that Debtor generally placed orders with Defendant on a weekly basis. (Tr. 19–20). During the months of November 1995 through February 1996, Defendant shipped furniture to Debtor as follows:

| Invoice Dates | Shipped | Returned | Net Amount Shipped |
| --- | --- | --- | --- |
| 11/02/95—11/30/95 | $15,119 | $784 | $14,335 |
| 12/01/95—12/29/95 | $14,620 | $451 | $14,169 |
| 01/05/96—01/13/96 | $ 8,876 | $ 98 | $ 8,778 |
| 02/02/96—02/13/96 | $ 1,098 | $145 | $ 953 |

(Tr. 16–23; Defendant Ex. 3–6).

Mr. Cook testified that the payment terms between Debtor and Defendant were "net 30 days" or 30 days from the date of invoice over the life of the parties' relationship. (Tr. 20). Prior to the early part of 1995, Debtor established a $10,000 credit line with Defendant. (Tr. 20–21). In early 1995, Debtor's credit line was increased to $15,000, and an additional increase to $25,000 took place in August 1995. (Tr. 20–21). This credit line remained the same until the Debtor's bankruptcy petition was filed. (Id.).

With respect to the payment history between the parties, Mr. Cook testified that Defendant attempted to have Debtor pay its invoices within 60 days from the date of invoice although the terms were "net 30 days." (Id.). This payment pattern existed over the life of the parties' relationship. (Tr. 22). Mr. Cook further testified that there were times when more than 60 days elapsed between the date of the invoice and date the invoice was paid. (Id.). It was also possible that invoices remained unpaid for over 90 days. (Id.). This was discouraged by the Defendant, but Debtor routinely paid beyond the net 30 days terms. (Id.). Invoices were paid with a company check, and Defendant never requested cash payment. (Tr. 25).

Mr. Cook testified that when the Debtor exceeded its credit line, he would call Mr. Charles Moskovitz, President of L. Bee Fur-

niture, and ask him to send a check to lower the balance, but no action was taken when invoices were not paid within 30 days. (Tr. 23–24). Mr. Cook further stated that the Defendant normally called Mr. Moskovitz at the end of each month and informed him of the dollar amount needed to bring the account within 60 days of outstanding invoice and below the $25,000 credit line. (Tr. 24). Within the past three years, Defendant never received a payment from Debtor without first contacting Mr. Moskovitz, and the calls made to Mr. Moskovitz were non-threatening and amicable. (Tr. 25–30). Defendant neither threatened to stop shipping furniture to Debtor, nor did Defendant threatened to take legal action against Debtor. (*Id.*). Also, no security interest was ever retained in the furniture Defendant sold to Debtor. (Tr. 31). This way of doing business remained the same over the duration of the parties' relationship. (Tr. 24).

Mr. Cook further testified that Defendant always accepted Debtor's post-dated checks for outstanding invoices since 1994. (Tr. 31, 74–75). Post-dated checks were given to Defendant as long as the parties have been doing business, and checks were usually post-dated from ten to fourteen days. (*Id.*). Defendant never objected to Debtor's request to hold checks for a week or to post-date checks and continued delivering furniture to Debtor. (Tr. 31). This information was confirmed by Mr. Moskovitz's testimony.

Charles W. Grant, Trustee of the Debtor's estate ("Plaintiff") presented evidence showing that during the preference period, Debtor made the following payments:

| Check Date | Date Check Cleared | Amount | Dates of Invoices |
|---|---|---|---|
| 11–27–95 | 11–28–95, # 28893 | $3,400 | 10–02–96 to 10–26–95 |
| 11–30–95 | 11–30–95, # 28894 | $3,500 | 09–13–95 to 10–31–95 |
| 12–07–95 | 12–11–95, # 29065 | $3,110.70 | 09–19–95 to 10–13–95 |
| 12–15–95 | 12–15–95, # 29066 | $3,661.70 | 09–20–95 to 10–13–95 |
| 12–22–95 | 12–22–95, # 29268 | $3,500 | 10–10–95 to 11–02–95 |
| 12–29–95 | 12–29–95, # 29269 | $3,500 | 11–02–95 to 11–17–95 |
| 01–04–96 | 01–04–96, # 29339 | $2,500 | 11–17–95 to 11–24–95 |
| 01–29–96 | 01–29–96, # 29668 | $3,400 | 11–14–95 to 12–14–95 |
| 01–31–96 | 01–31–96, # 29669 | $3,400 | 10–28–95 to 12–15–95 |
| 02–05–96 | 02–05–96, # 29670 | $3,400 | 11–02–95 to 12–19–95 |
| | TOTAL | $33,372.40. | |

(Plaintiff Ex. 1–10). Mr. Cook testified, and Mr. Moskovitz confirmed, that Debtor never told Defendant how each check should be applied, and the checks received from Debtor were applied to the oldest outstanding invoices. (Tr. 33–34; 74–75). For example, check number 28893, dated 11–27–95 for $3,400 was applied to invoices dated 09–18–95 through 09–27–95; check number 28894, dated 11–30–95 for $3,500 was applied to invoices dated 09–27–95 through 10–04–95; and check number 29065, dated 12–07–95 for $3,110.70 was applied to invoices dated 10–04–95 through 10–10–95. (Tr. 44–46; Defendant Ex. 8). The other seven payments were applied in similar fashion. (*Id.*).

Defendant also presented evidence regarding Defendant's business relationship with its other approximately 300 customers. Mr. Cook further testified that the company's other customers also paid beyond the net 30 days terms. (Tr. 22). Also, other customers have asked Defendant to hold checks and have paid with post-dated checks. (Tr. 32). Mr. Moskovitz also testified that it was normal for other wholesalers to have normally accepted post-dated checks. (Tr. 71).

Mr. Elmer James, owner of Regal Furniture, Inc., testified of his general knowledge of industry standards in the retail furniture business. (Tr. 82–102). Mr. James has been in the retail furniture business since 1965 when he began working for Sears, Roebuck & Company. (Tr. 96). He then began operating Regal Furniture Store on April 1, 1974. (Tr. 82). Regal Furniture is also one of Defendant's customers. (*Id.*). Mr. James testified that it was very common for him ask

Defendant to withhold depositing a check and has given Defendant many post-dated checks dating back to 1974. (*Id.*). Mr. James further testified that this is a common way of conducting business in the furniture industry. (Tr. 85–86). *See also* Defendant Ex. 11. Also, it is very common for furniture wholesalers and retailers to allow their credit terms to go beyond the net 30 days, although the invoices indicate "net 30 days" terms. (Tr. 91).

Defendant concedes that all the requirements of subsection 547(b) are satisfied, and Defendant asserts three affirmative defenses pursuant to subsections 547(c)(1), (2) and (4). (Adv.Rec. 12). Defendant, in its post-trial brief, abandoned subsection 547(c)(1) as an affirmative defense and maintains that transfers sought to be avoided are within the ordinary course of business exception under 547(c)(2) and the new value exception under 547(c)(4). (*Id.*).

### CONCLUSIONS OF LAW

The issues in this proceeding are: (1) whether the transfers sought to be avoided were made within the ordinary course of business exception under subsection 547(c)(2) of the Bankruptcy Code; and (2) whether Defendant is entitled to the new value exception under subsection 547(c)(4) of the Bankruptcy Code. The Court will address each issue accordingly.

### A. Ordinary Course of Business Exception

■■■ Defendant asserts that the transfers at issue were payments made in the ordinary course of business and are precluded from being avoided by Plaintiff pursuant to subsection 547(c)(2). (Adv.Rec. 12). Subsection 547(c)(2) provides that:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of

business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms[.]

11 U.S.C. § 547(c)(2) (1994). The Eleventh Circuit Court of Appeals has highlighted that the Congressional intent of subsection 547(c)(2) is "to leave undisturbed normal financial relations, because [such an exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditor during the debtor's slide into bankruptcy." *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566 (11th Cir.1986) (citing H.R.Rep. No. 595, 95th Cong. 1st Sess. 373–74 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6329) (alterations in original). The creditor has the burden of proving that the requirements for the ordinary business exception have been satisfied. *Grant v. Sun Bank/North Central Florida, et al. (In re Thurman Construction, Inc.)*, 189 B.R. 1004, 1011–12 (Bankr. M.D.Fla.1995) (citing *Braniff v. Sundstrand Data Control, Inc. (In re Braniff, Inc.)*, 154 B.R. 773, 780 (Bankr.M.D.Fla.1993)). The standard of proof is preponderance of the evidence. *Id.* Subsection 547(c)(2) should be narrowly construed. *Id.*

The parties have agreed that subparagraph "A" of subsection 547(c)(2) is satisfied because the debt was incurred in the ordinary course of business between the Debtor and Defendant. Therefore, this Court must resolve whether subparagraphs "B" and "C" of subsection 547(c)(2) are also satisfied.

The parties have, however, disagreed on the proper construction of subparagraphs "B" and "C" of subsection 547(c)(2). The Plaintiff argues that the Court should conduct a subjective inquiry of subparagraph "B" of 547(c)(2) by examining only the relationship between the debtor and creditor, while subparagraph "C" of 547(c)(2) should be analyzed objectively by looking at the

industry norms. (Adv.Rec. 11). However, Defendant argues that both subparagraphs "B" and "C" of subsection 547(c)(2) should be analyzed by looking only to the Debtor and Defendant's long standing relationship over the past thirty years. (Adv.Rec. 12). Therefore, this Court must first decide how subparagraphs "B" and "C" should be construed.

A minority of courts have construed subparagraph "B" subjectively, examining only the relationship between the particular parties and construed subparagraph "C" objectively, looking at industry norms. *See, e.g., Fiber Lite Corp. v. Molded Acoustical Prod., Inc. (In re Molded Acoustical Prod. Inc.),* 18 F.3d 217, 226 (3rd Cir.1994) (stating that: "[W]e read subsection C as establishing a requirement that a creditor prove that the debtor made its pre-petition preferential transfers in harmony with the range of terms prevailing as some relevant industry norms."); *In re Tolona Pizza Prod. Corp.,* 3 F.3d 1029, 1033 (7th Cir.1993) (concluding that "ordinary course of business terms" refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage); *Logan v. Basic Dist. Corp. (In re Fred Hawes Org. Inc.),* 957 F.2d 239, 245 (6th Cir.1992) (holding that subsection C requires proof that the payment is ordinary in relation to the standard prevailing in the relevant industry); *Yurika Foods Corp. v. United Parcel Service (In re Yurika Foods Corp.),* 888 F.2d 42, 45 (6th Cir.1989) (examining industry norms to determine whether subparagraph "C" has been satisfied).

These courts have reasoned that, "the difficulty with the majority approach is that it ignores subparagraph 'C' and thereby makes it a nullity, or it interprets subparagraph 'C' to require the same showing as subparagraph 'B' and thereby makes it superfluous." *See Fred Hawes Org. Inc.,* 957 F.2d at 243–44. These courts further reasoned that Congress clearly intended to establish separate, discreet, and independent requirements for subparagraphs "B" and "C" which creditors would have to fulfill to prevent avoidance. *Id.* Thus, subparagraph "C" should be con-

strued objectively, establishing a requirement that a creditor prove that the debtor made its pre-petition preferential transfers in harmony with industry norms. *Id.*

However, a majority of courts, including the courts in this district, have conducted a subjective inquiry into subparagraphs "B" and "C" of subsection 547(c)(2). *See, e.g., Thurman,* 189 B.R. at 1012; *Braniff,* 154 B.R. at 780; *Hyman v. Stone Lumber Co. (In re Winter Haven Truss Co.),* 154 B.R. 592, 594 (Bankr.M.D.Fla.1993) (citations omitted); *Florida Steel Corp. v. Stober (In re Industrial Supply Corp.),* 127 B.R. 62, 65 (Bankr.M.D.Fla.1991) (Kovachevich, C.J.) (citations omitted). In addition, although the Eleventh Circuit Court of Appeals has not explicitly stated whether subparagraphs "B" and "C" should be construed subjectively, it focused only on relationship between the debtor and creditor to make its determinations as to subparagraphs "B" and "C." *See Craig Oil Co.,* 785 F.2d at 1566–68.

■ In a similar proceeding in this main case, the subjective inquiry was adopted as the appropriate standard of analyzing both subparagraphs "B" and "C." *See Grant v. SunTrust Bank (In re L. Bee Furniture),* 203 B.R. 778 (Bankr.M.D.Fla.1996). In that case, the court was persuaded by *Graphic Prod. Corp. v. WWF Paper Corp. (In re Graphic Prod. Inc.),* 176 B.R. 65 (Bankr. S.D.Fla.1994) (Cristol, C.J.). In *Graphic Prod.,* a Chapter 11 debtor-in-possession brought an adversary proceeding to avoid alleged preferential transfers, and the defendant asserted, among other things, the ordinary course of business exception pursuant to subsection 547(c)(2). *Id.* at 68. The plaintiff contended that the court should have required compliance with terms ordinary in the industry. *Id.* at 71. The court found that subparagraph "C" must be analyzed by examining the business practices between the particular parties involved and not to the generally prevailing industry practices. *Id.* The court reasoned that:

[R]eading 11 U.S.C. § 547(c)(2)(C) as requiring compliance with the terms ordi-

nary in the industry would negate any benefit the exception would convey. That reading would require that the parties would conduct themselves according to business norms, restricting their chosen course of dealing to an industry standard. The exception was created to allow debtors and creditors to continue in their normal course of business, and 'discourage unusual action by either the debtor or his creditor during the debtor's slide into bankruptcy'.... To hold otherwise would be to place the exception out of reach of all those debtors and creditors for whom it was written.

*Id.* (quoting *In re Equipment Co. of Am.*, 135 B.R. 169, 173 (Bankr.S.D.Fla.1991)). The *Grant v. SunTrust* court concluded that this rationale is in accord with the courts in this district and the Eleventh Circuit Court of Appeals. *L. Bee*, 203 B.R. at 781–82 (citing *Craig Oil Co.*, 785 F.2d at 1566–68; *Thurman*, 189 B.R. at 1012.). Accordingly, this Court will also examine both subparagraphs "B" and "C" subjectively, looking only to the relationship between the parties.

■ Having concluded that the subjective analysis is appropriate in determining whether transfers were made within the ordinary course of the parties' business and ordinary business terms, the Court now turns to applying the following four factors outlined in *Florida Steel*, 127 B.R. at 65. In *Florida Steel*, the court held that the 547(c)(2) inquiry should focus on the business practices unique to the particular parties involved, not industry practices and the following factors should be used to determine whether the exception has been established: (1) the prior course of dealing between the parties, (2) the amount of the payments, (3) the timing of the payments, and (4) the circumstances surrounding the payments. *Florida Steel*, 127 B.R. at 65. These factors were also adopted in *Thurman*. *See Thurman*, 189 B.R. at 1011–12.

■ The first factor the Court considers is the prior course of dealing between the parties. In this proceeding, the prior course of dealing between Debtor and Defendant reveals that before and during the preference period, payments were always made outside of the "net 30 days" terms. (Defendant Ex. 8–9). Defendant always accepted Debtor's post-dated checks, and Defendant called Debtor's President monthly before a check was received. (Tr. 22–30; 74–75). Thus, the course of dealing between the parties remained the same before and during the preference period.

The second factor considered is the amount of the payments. Before the preference period, the amount of each payment to Defendant generally ranged from approximately $2,300 to over $8,000. (Defendant Ex. 9). During the preference period the amount of each payment ranged from $2,500 to $3,661.70. (Plaintiff Ex. 1–10; Defendant Ex. 8). Therefore, the record does not reveal that Debtor paid Defendant unusually large sums of monies during the preference period.

The third factor deals with the timing of each payment. The Eleventh Circuit has held that "lateness" is an important factor in deciding whether payments should be protected by the ordinary course of business exception. *Craig Oil*, 785 F.2d at 1567. There is a presumption that late payments are outside the ordinary course of business, but such presumption may be overcome by a showing that late payments were in the ordinary course of the parties' business. *Braniff*, 154 B.R. at 780–81.

In this proceeding, both Mr. Cook and Mr. Moskovitz testified that late payments were within the ordinary course of the parties' business. (Tr. 20–22, 31, 71–75). Although the Defendant's invoices indicated "net 30 days" terms, Debtor routinely paid beyond the 30 day period. (Tr. 22–30; 74–75). Mr. Cook and Mr. Moskovitz testified that this was their usual way of practicing business over the past twenty years, and this practice remained the same during the preference period. (*Id.*). Therefore, Defendant has overcome the presumption that late payments were not in the ordinary course of business.

Finally, with the fourth factor, the Court examines the circumstances surrounding the payments. Subsection 547(c)(2) protects those payments that do not result from "unusual" or "extraordinary" debt collection practices. *Craig Oil Co.*, 785 F.2d at 1567. Plaintiff, in this proceeding, argues that Defendant conducted unusual collection activity because each payment made during the preference period was made in response to Mr. Cook's telephone contact with Mr. Moskovitz. Mr. Cook, however, testified that it was routine for him to call Mr. Moskovitz at the end of each month and to ask him to send Defendant a check in an amount that would lower the outstanding balance and bring the account within 60 days outstanding or below the $25,000 credit line. (Tr. 24). Within the past three years, Defendant never received a payment from Debtor without first contacting Mr. Moskovitz, but the calls made to Mr. Moskovitz were non-threatening and amicable. (Tr. 25–30). There were no threats to stop shipments of furniture to Debtor, nor were there any threats to take legal action against Debtor. (*Id.*). Also, Defendant did not retain a security interest in the furniture sold to Debtor. (Tr. 31).

Mr. Moskovitz also testified that Defendant always accepted Debtor's post-dated checks, invoices were always paid beyond 30 days from the date of invoice, and Defendant never received any threatening correspondence regarding outstanding debts. (Tr. 70–76). In addition, Defendant always accepted Debtor's checks and was never asked to pay with cash. (*Id.*). The parties conducted business in this fashion over the course of their relationship and did not change during the preference period. (*Id.*). Therefore, the Court concludes that Defendant has met it burden of proving that preferential transfers in the amount of $33,372.40 were made in the ordinary course of business and are not avoidable.

■ Even if the subparagraph "C" of section 547(c)(2) requires compliance with terms ordinary in the industry, the preferential transfers were made within ordinary business terms. When applying industry standards, the creditor must prove that the debtor made its transfers in accordance with the range of terms prevailing as some relevant industry norms. *Fiber Lite*, 18 F.3d at 226.

In this proceeding, Plaintiff contends that payments were not made in accordance with industry norms because Defendant accepted Debtor's post-dated checks. (Adv.Rec. 11). Defendant, however, presented evidence showing that Defendant accepted post-dated checks from its other customers and other customers have asked Defendant to hold checks. (Tr. 32). Mr. Moskovitz also testified that it was normal for other wholesalers to have normally accepted post-dated checks. (Tr. 71). Defendant also presented a witness, Mr. Elmer James, who has been in the retail furniture business since 1965 when he began working for Sears, Roebuck & Company. (Tr. 96). Mr. James testified that it is very common for him to ask Defendant to withhold depositing a check and has given Defendant post-dated checks dating back to 1974. (*Id.*). Mr. James further informed the Court that his way of conducting business is very common in the industry. (Tr. 85–86). *See also* Defendant Ex. 11. Mr. James further testified that it is very common for furniture wholesalers and retailers to allow their credit terms to go beyond the net 30 days, although invoices indicated a net 30 days. (Tr. 91). Plaintiff presented no evidence that would refute Mr. James' testimony. Therefore, even if the industry standard is appropriate, the transfers were made in accordance with ordinary business terms.

## B. New Value Exception

Next, Defendant raised the "New Value" defense pursuant to subsection 547(c)(4) of the Bankruptcy Code. Having concluded that the transfers are protected under 11 U.S.C. § 547(c)(2), the Court will not address the new value exception.

## CONCLUSION

Defendant has proved by preponderance of the evidence that the requirements for the

ordinary course of business exception have been satisfied, and that it is entitled to retain the preferential transfers totalling $33,-372.40. The Court will enter a separate order consistent with these findings of fact and conclusions of law.