**In re BRANIFF, INC., Debtor.**

**CONOCO, INC., Plaintiff,**

**v.**

**BRANIFF, INC., Defendant.**

**Bankruptcy No. 89–03325–BKC–6C1.**
**Adv. No. 89–233.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

April 18, 1990.

Jeffry R. Jontz, Holland & Knight, Orlando, Fla., for plaintiff.

Howard T. Glassman, Joel C. Shapiro, Faith R. Greenfield, Earl M. Forte, III, and Gregg A. Parker of Blank, Rome, Cominsky & McCauley, Philadelphia, Pa., for defendant.

Harry D. Lewis of Milgram, Thomajan & Lee, Orlando, Fla. for Official Committee of Unsecured Creditors.

David M. Levine of McDermott, Will & Emery, Miami, Fla., for Official Committee of Noteholders.

## MEMORANDUM OPINION

**C. TIMOTHY CORCORAN, III,** Bankruptcy Judge.

This adversary proceeding is an action for reclamation of goods pursuant to Section 546(c) of the Bankruptcy Code and Section 2–702 of the Uniform Commercial Code. The trial was consolidated with the final hearing in a companion contested matter, pending in the main Chapter 11 bankruptcy case, that was initiated by the filing of a motion to lift the automatic stay provided by Section 362 of the Bankruptcy Code (Document No. 93, S–6). The motion for relief from stay seeks an order permitting Conoco to exercise its applicable non-bankruptcy remedies to retrieve the goods.

Conoco, Inc., the plaintiff in the adversary proceeding and the movant in the contested matter, is a supplier of aviation fuel. Between September 19, 1989, and September 27, 1989, Conoco supplied aviation fuel to the debtor defendant, Braniff, Inc., at airports at Dallas–Fort Worth, Texas, Kansas City, Missouri, Wichita, Kansas, and

Omaha, Nebraska. On September 28, 1989, Braniff filed in this court a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. Conoco now seeks to reclaim the aviation fuel supplied to Braniff between September 19 and 26, 1989, at the Dallas–Fort Worth and Kansas City airports.[1] For the reasons stated here, Conoco has established its right to reclaim some of the fuel but has failed to establish its right to reclaim the remainder.

## Findings of Fact

Braniff is an airline that uses aviation fuel in its aircraft in the ordinary course of business. Braniff had an agreement with Conoco entitled "Aviation Fuel Sales Agreement" wherein Conoco agreed to sell to Braniff Braniff's requirements for Jet A aviation fuel. The agreement required Braniff to prepay Conoco by wire transfer each Wednesday for its estimated purchases of fuel during the next Thursday through Wednesday period. At the end of every month, Conoco would compute the amount of prepaid purchases by Braniff during that month. Those amounts were then reconciled, and any payment overage or shortage would be debited or credited, as appropriate, and carried forward into the next month in a "rolling" fashion. The agreement further provided for FOB "storage facility provided for or arranged by [Braniff]" at Kansas City and Dallas–Fort Worth. Conoco was Braniff's only supplier at Dallas–Fort Worth; it was one of Braniff's four suppliers at Kansas City.

Fuel reached the vicinities of the Kansas City and Dallas–Fort Worth airports through an interstate common carrier pipeline that was used by numerous suppliers, including Conoco. The pipeline contains "breakout" points where fuel is directed out of the pipeline for use or storage. At the Kansas City and Dallas–Fort Worth airports, "breakout" points occur where fuel is directed into "tank farm" storage facilities operated by Ogden Allied Aviation Services.

Braniff had designated Ogden Allied as its fueling agent in Dallas–Fort Worth, Kansas City, Omaha, and Wichita. Other airlines has similarly designated Ogden Allied as their fueling agent at these airports.

The tank farms at Dallas–Fort Worth and Kansas City contain fuel supplied by numerous suppliers to be used by airlines operating at those airports, including Braniff. In other words, fuel from numerous suppliers is pumped through the common carrier pipeline to the Ogden Allied tanks where it is commingled and stored until needed by the various airlines that have had the fuel delivered to the tanks.

Neither Braniff nor any of the other airlines owns or operates the tank farms at Kansas City or Dallas–Fort Worth. Each, however, is entitled to use fuel that has been placed into the tank farms and "allocated" to their respective accounts by Ogden Allied. The fuel stored in the tank farms is then used by each participating airline in its airline operations at the respective airport. Braniff has no control over any of the fuel contained at Ogden Allied's facilities that has not been allocated to it.

The amount of fuel allocated to Braniff typically equals the amount of fuel for which it has prepaid Conoco, and its other suppliers, as the case may be. At any time, Braniff would not have direct knowledge as to the amount of fuel for which it had prepaid and had on hand at the tank farms in Kansas City or Dallas–Fort Worth. It relied upon its fueling agent, Ogden Allied, to maintain that information. If it needed that information, it would obtain it from the fueling agent.

When fuel was delivered by Conoco through the common carrier pipeline to

---

1. At trial, Conoco conceded that it could not prove its case for reclamation of the fuel delivered at the Wichita and Omaha airports because of its inability to establish the "identification" and "possession and control" elements of its claim. Accordingly, the court is required to decide only the issues relating to the shipments to the Dallas–Fort Worth and Kansas City airports.

Braniff's fueling agent at the Dallas–Fort Worth and Kansas City airports, the amount of fuel delivered would be measured in two ways. First, it would be measured by the common carrier when it left the common carrier's facility by pipe to the fueling agent's tank farm. Second, it would be measured by the fueling agent when it arrived by pipe at the fueling agent's tank farm.

Billing and accounting would be handled in this fashion: Upon receipt of fuel designated for Braniff, the fueling agent would prepare a bill of lading and send it to Conoco's treasury department. Conoco's treasury department would then use that bill of lading to generate an invoice and book the account receivable. Normally, it would take one to three days after the shipment of fuel to generate the invoice and book the account receivable. Depending upon the way weekends fell, however, the invoicing and booking could sometimes follow by as much as five days. Although Braniff made projections at the beginning of the contract year about the amount of weekly payments that would be made to Conoco under the aviation fuel sales agreement, these estimates were adjusted regularly for experience. The amount actually paid each Wednesday by wire transfer would therefore vary.

Braniff made a payment of $320,000 on September 20, 1989, for anticipated fuel needs through September 27. The next payment was scheduled to be made on September 27, 1989. This payment was originally scheduled to be in the amount of $420,000 but was later revised to be $285,000 based upon anticipated usage. The payment was not made on September 27, and Braniff then filed its Chapter 11 petition in the early morning hours of September 28, 1989.

On September 29, 1989, Conoco sent Braniff a "Notice of Reclamation" under Section 546(c) of the Bankruptcy Code and Section 2–702 of the Uniform Commercial Code seeking reclamation of unpaid fuel delivered into the tank farms at Dallas–Fort Worth and Kansas City, and directly into the fuel tanks of Braniff's aircraft at Wichita and Omaha,[2] during the previous ten-day period.

The notice of reclamation identified the fuel for which reclamation was sought by specifying 14 bills of lading. These bills of lading were listed by bill of lading number, shipment date, product type (all jet fuel type A), the net gallons in that shipment, and the total price for that shipment. These bills of lading represented shipments occurring from September 19, 1989, through September 27, 1989. The notice did not identify the location where any of the shipments had been received. Although Braniff's fueling agent, Ogden Allied, generated the bills of lading and could have identified the location of each, no one at Braniff had the bills of lading or could match the bills to any location or shipment. In part, this is because the monthly statement for September had not been prepared by Conoco and presented to Braniff at the time the reclamation notice was given.

In preparation for trial, Conoco prepared a summary of shipments made to Braniff during the month of September. The statement (plaintiff's exhibit 41) reflected the date of receipt of each shipment, the location at which it was received, the bill of lading number, the invoice amount represented by the shipment, and a running balance due after each shipment was booked to the Braniff account. The summary also reflected payments made by Braniff on the account. The summary did not reflect the parties actual practice because it charged the fuel shipments to the account on the date they actually occurred rather than the one to five days later as was the parties actual practice. The effect of the schedule, therefore, was to take the "float" out of the account.

Excerpted data from that schedule for the ten-day period before the demand for reclamation is set forth below:

---

**2.** At Wichita and Omaha, the tank farm system employed at Kansas City and Dallas–Fort Worth was not used. Instead, the fuel was delivered directly into the fuel tanks of the Braniff aircraft. It is largely for this reason that Conoco acknowledged it could not prove its case as to fuel delivered there. See footnote 1, *supra.*

| SHIPMENT DATE | LOCATION | B/L NO. | INVOICE AMT. | | RUNNING TOTAL | |
|---|---|---|---|---|---|---|
| | Beginning Balance of Excerpt | | | | $ 74,856.79 | cr. |
| 9/19 | Dallas–FW | 22850 | $ 58,801.17 | | | |
| 9/19 | Omaha | 7858 | 1,436.18 | | 14,619.44 | cr. |
| 9/20 | Kansas City | 81883 | 137,577.03 | | | |
| 9/20 | Payment | Wire | 320,000.00 | cr. | 197,042.41 | cr. |
| 9/21 | Omaha | 7863 | 1,226.88 | | | |
| 9/21 | Wichita | 7748 | 4,314.54 | | | |
| 9/21 | Kansas City | 81887 | 154,197.56 | | 37,303.34 | cr. |
| 9/23 | Kansas City | 81895 | 78,165.98 | | 40,862.64 | |
| 9/24 | Kansas City | 81899 | 143,406.68 | | 184,269.32 | |
| 9/26 | Dallas–FW | 22873 | 58,801.17 | | 243,070.49 | |

After month end adjustments and credits not relevant here, and after excluding shipments to Omaha and Wichita for which Conoco has abandoned its reclamation claim, the balance due Conoco from Braniff is $196,328.86 [3] representing 325,912 gallons.

The schedule, and the excerpts printed above, show that Braniff maintained a credit balance in its account for the prepayment of fuel through September 21. A shipment was made at Kansas City on September 23 that exhausted the credit and established a balance due. A shipment at Kansas City on September 24 further added to the balance due, as did a shipment at Dallas–Fort Worth on September 26. Thus, it is only these last three shipments that Conoco now seeks to reclaim. These three shipments were included among the 14 described in the notice of reclamation.[4]

The three shipments total 441,534 gallons. Bill of lading 81895 represents 120,485 gallons at 64.8 cents per gallon. Of this shipment, 57,425 gallons were paid by exhausting the credit balance in Braniff's account, leaving 63,060 gallons unpaid. Bill of lading 81899 represents 221,047 gallons at 64.8 cents per gallon. Bill of lading

22873 represents 100,002 gallons at 58.8 cents per gallon.

On September 18, 1989, the ending fuel allocation inventory for Braniff in the Ogden Allied tank farm at Dallas–Fort Worth, where Conoco is Braniff's only supplier, was 39,212 gallons. This amount represented fuel delivered by Conoco through the pipeline to the tank farm for Braniff on or before September 18, 1989. Beginning on September 19, 1989, through September 29, 1989, Conoco delivered 200,004 gallons of fuel to the Ogden Allied tank farm at Dallas–Fort Worth. During the same period, Braniff used 126,758 gallons of fuel at Dallas–Fort Worth. Braniff's ending fuel inventory at Dallas–Fort Worth on September 29, 1989, was 133,550 gallons.[5]

On September 18, 1989, the ending fuel allocation inventory for Braniff in the Ogden Allied tank farm at Kansas City, where Braniff used several suppliers, including Conoco, was 691,912 gallons from all suppliers. Beginning on September 19, 1989, through September 29, 1989, Conoco delivered 791,273 gallons of fuel to the tank farm for Braniff. Braniff's other suppliers also delivered fuel into the tank farm during that period as follows: PST, 218,317

---

**3.** Braniff owes Conoco another $9,562.80 for fuel delivered at Omaha and Wichita during the September 24 through 27 period that has been excluded from the total stated in the text.

**4.** Of the 11 shipments on the reclamation notice as to which Conoco no longer seeks reclamation, eight were Omaha or Wichita shipments. See footnote 1, *supra*. Two were Kansas City shipments for which Braniff had paid through a credit balance in the account, and one was a

Dallas–Fort Worth shipment for which Braniff had paid through a credit balance in the account.

**5.** The court recognizes that the addition and subtraction of the gallons indicated does not result exactly in the number of gallons stated for the ending fuel inventory. Nevertheless, these are the numbers of gallons agreed by the parties, and the court therefore accepts them.

gallons; Mobil, 206,772 gallons; and Texaco, 327,081 gallons. Thus, all suppliers, including Conoco, supplied Braniff 1,543,443 gallons. During the same period, Braniff used 1,864,098 gallons of fuel from all suppliers at Kansas City. Braniff's ending fuel inventory at Kansas City on September 29, 1989, from all suppliers was 397,735 gallons.[6]

The parties have stipulated for purposes of this adversary proceeding and contested matter only that Braniff was insolvent during the September 19–29 time period.

### Conclusions of Law

This court has jurisdiction of the parties and of the subject matter pursuant to Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and the standing order of reference entered by the district court. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (G), and (O).

The aviation fuel constitutes "goods" within the meaning of Section 546(c) of the Bankruptcy Code and the Uniform Commercial Code.

Section 546(c) of the Bankruptcy Code and Section 2–702 of the Uniform Commercial Code[7] govern the rights of Conoco to reclaim these goods from Braniff.

In order to establish entitlement to reclamation from a debtor under Section 2–702 of the Uniform Commercial Code and Section 546(c) of the Bankruptcy Code, a reclaiming seller must satisfy the following four-part test:

1. the debtor was insolvent at the time the goods were delivered by the seller;

2. a written demand was made on the debtor within ten days after the goods were delivered to the debtor;

3. the goods were identifiable at the time the demand was made; and

4. the goods were in the possession and control of the debtor at the time the demand was made.

6. See preceding footnote.

7. The parties agree that, as to the applicable principles of the Uniform Commercial Code, this case presents no conflicts of laws issue. They agree that the court is to apply Section

*Eighty–Eight Oil Co. v. Charter Crude Oil Co. (In re Charter Co.),* 54 B.R. 91, 92 (Bankr.M.D.Fla.1985); *see also Bethlehem Steel Corp. v. Wheeling–Pittsburgh Steel Corp. (In re Wheeling–Pittsburgh Steel Corp.),* 74 B.R. 656, 659 (Bankr.W.D.Pa. 1987). It is also axiomatic to a reclamation claim that the seller has not been paid for the goods. *In re Wheeling–Pittsburgh, supra* at 659.

In addition, the burden of proof in reclamation actions is on the seller of the goods; the evidence must show that the "critical fact on which ... recovery depends is true, and not merely that it is possible." *Flav–O–Rich, Inc. v. Rawson Food Service, Inc. (In re Rawson Food Service, Inc.),* 846 F.2d 1343, 1347, 1348 (11th Cir.1988). The testimony heard at trial also "must be viewed in the light most favorable to the debtor," as the requirements for showing entitlement to reclamation are "rather stringent." "If the evidence is in equipoise, the debtor prevails." *Id.*

In this action, Braniff and Conoco have stipulated, for purposes of this matter only, that Braniff was insolvent during the ten-day period in question, September 19 through September 29, 1989. It is also undisputed that the reclamation notice was received by Braniff on September 29, 1989. Thus, the legal issues upon which this case turns involve the legal sufficiency of the written demand for reclamation; whether the fuel was identifiable and in Braniff's possession and control; the amount of fuel in which Conoco has established reclamation rights, if any; and the appropriate relief to which Conoco may be entitled.

### 1. *Was the demand notice legally sufficient?*

Conoco made a written demand for reclamation on September 29, 1989. The demand was received by Braniff on that day.[8]

2–702 generally rather than as adopted as the law of any one state.

8. There is no issue in this case arising from a delay in the receipt of the notice. For purposes

Braniff contends that the demand for reclamation was insufficient as a matter of law because of the unique character of the fuel delivery system in question. Simply put, Braniff contends that the notice did not adequately inform Braniff of what fuel Conoco sought to reclaim.

Conoco's demand sought reclamation of "all petroleum products receive[d] by you during the last ten days while you were insolvent." The notice further provided that it "cover[ed], but is not limited to, the following shipments made from various locations on the dates set forth below and received by you since September 19, 1989." The notice then contained a list of some 14 shipments described by bill of lading number, shipment date, product type (all was jet fuel type A), net gallons, and product cost.

Braniff contends that this notice is inadequate because it fails to indicate from which locations Conoco seeks to reclaim fuel or to which location each listed shipment was made. Moreover, the notice contains a list of "shipment dates," not receipt dates, the latter being the critical point for determining the beginning of the running of the ten-day period.[9] There is a lag time of several days, of course, between the shipment dates listed in the notice and the date each shipment was received and placed into the tank farms. Braniff therefore contends that it is impossible to determine from the face of the notice on what dates the deliveries were received and at what locations.

Braniff asserts these deficiencies because it was only at the end of each month that Braniff reconciled the bills of lading, invoices, and monthly statements it received from Conoco with the statements provided by the fueling agent to determine

how much fuel was actually delivered. It was not until October 17, 1989, that Conoco provided Braniff with a statement for September fuel deliveries.

Finally, Braniff contends that the notice was insufficient because it was not possible to determine from the notice which shipments were paid for in advance by Braniff and were therefore not subject to reclamation. On this point, of course, Braniff prepaid Conoco $320,000 on September 20, 1989, for anticipated fuel needs through September 27, 1989.

■ Neither Section 546(c) of the Bankruptcy Code nor Section 2–702 of the Uniform Commercial Code include specific requirements for what must be contained in a reclamation demand other than the Code's additional requirement that the demand be in writing. There is also surprisingly little case law setting forth the content requirements of the demand. See, for example, *Montello Oil Corp. v. Marin Motor Oil, Inc. (Marin Motor Oil, Inc.)*, 740 F.2d 220 (3d Cir.1984); *Harris Trust & Savings Bank v. Wathen's Elevators, Inc. (In re Wathen's Elevators, Inc.)*, 32 B.R. 912 (Bankr.W.D.Ky.1983); and *In re Flagstaff Foodservice Corp.*, 56 B.R. 910 (Bankr.S.D. N.Y.1986). Considering the fundamental purpose of a demand for reclamation, therefore, the court concludes that, to be sufficient, the demand must identify the goods as to which reclamation is sought so as to permit their return pursuant to the demand at the time the demand is made. If the demand fails to be sufficiently detailed to accomplish that purpose, it must of necessity fail as a matter of law.

■ In this case, Braniff is quite correct that its fuel accounting personnel were unable to identify the fuel that Conoco sought to reclaim from the notice of reclamation

---

of the decision here, therefore, the demand is considered received when made.

**9.** The parties' contract, of course, provided for Conoco to deliver the fuel to the tank farms (at Kansas City and Dallas–Fort Worth) or to Braniff's aircraft (at Omaha and Wichita). The obligation to pay in accordance with the agreement arose upon delivery and receipt. The seller's reclamation rights turn on making written demand "before ten days after *receipt* of such

goods by the debtor." 11 U.S.C. § 546(c)(1) (Emphasis added). As the evidence developed at trial, only three shipments, received on September 23, 24, and 26, remain in issue. The receipt of *these shipments* was well within the ten-day period before the September 29 demand. No issue remains, therefore, regarding when the reclamation period for any shipment began to run.

that it received. Conoco attempted to identify the fuel by data that, at the time of receipt of the demand, was not yet known to Braniff. In the usual course, it would not be until the invoicing, receipting, and month end reconciliation before Braniff and its fuel accounting department would have been able to identify the fuel described by Conoco in its notice.

On the other hand, Braniff's fueling agent, Ogden Allied, did have the ability, on the date Braniff received the reclamation notice, to determine precisely what fuel Conoco was claiming and whether that fuel had been received (or was still in transit in the common carrier pipeline). Under traditional principles of the law of agency, therefore, the court must attribute the agent's knowledge to the principal even in these circumstances where the principal did not hold the knowledge directly. *Cf. Transurface Carriers, Inc. v. Ford Motor Co.*, 738 F.2d 42, 45 (1st Cir.1984). Upon receipt of the reclamation notice, Braniff could easily have gone to its fueling agent for each location at which Braniff purchased Conoco fuel. Braniff had only one fueling agent serving the four locations where Braniff purchased fuel from Conoco. Braniff could have provided to that fueling agent the information received from Conoco, and, as a relatively simple matter, the fueling agent could have matched shipments with deliveries, identified which shipments might not have been received, determined where the shipments were received, and otherwise provide the data Braniff would need to determine what shipments remained unpaid after applying the $320,-000 payment made on September 20, 1990. Although this information would normally not be provided for several days in the ordinary course of affairs, it was nevertheless available and could have been compiled and provided merely for the asking.

In these circumstances, therefore, the court concludes that Conoco's reclamation demand was indeed legally sufficient for the purposes of the Bankruptcy Code and the Uniform Commercial Code.

**2.** *Was the fuel identifiable and in Braniff's possession and control at the time demand was made?*

Braniff contends that the fuel at issue here was neither identifiable nor in its possession and control at the time the reclamation demand was made because of the commingling that occurred in the common carrier pipelines and at the airport tank farms. Braniff points out that the fuel was pumped through a common carrier pipeline from Conoco's refineries with petroleum products belonging to numerous other suppliers. Once the fuel was received at the Ogden Allied tank farms, it was then commingled in large tanks with fuel supplied by other suppliers and allocated to and for the use of numerous users. At Dallas–Fort Worth, the commingled fuel allocated to Braniff had been supplied solely by Conoco. At Kansas City, the fuel allocated to Braniff had been supplied by four suppliers, including Conoco.

**a.** Does the fuel delivery system utilized at Dallas–Fort Worth and Kansas City preclude Conoco from meeting its "identification" and "possession and control" burdens?

In the case of fungible, bulk petroleum products, such as jet fuel type A, the "identification" and "possession and control" requirements of the Code and the UCC mandate that the reclaiming party:

trace the [fuel] from its possession into an identifiable mass and to show that the mass contains only [fuel] of like kind and grade. *See In re Iowa Egg Co.*, 96 F.Supp. 390 (S.D.Iowa 1951). If the mass of [fuel into which the fuel is traced] is subject to [the debtor's] control, then it is both "identifiable" and "in the possession of the debtor."

*Charter, supra* at 93.

In *Charter,* the court held that crude oil placed by the seller into the debtor's trucks, then moved by the debtor to the debtor's storage tanks, then automatically pumped out of the debtor's storage tanks into a common carrier pipeline, was part of an "identifiable mass" that was sufficiently

in the debtor's possession and control at the time demand was made. *Id.*

In this case, the jet fuel type A was shipped from Conoco's refineries through a common carrier pipeline where it was commingled with other jet fuel type A refined by other suppliers and sold to other users. The commingling further occurred in the airport tank farms, from which many airlines withdrew the fuel that was ultimately pumped into airplanes. Plainly, on these facts, Conoco has traced its fuel into an identifiable mass containing only fuel of like grade and quality.

Likewise, Conoco has shown that the mass of fuel in the airport tank farms was subject to Braniff's control. The tank farms were owned and operated by Braniff's fueling agent. The fueling agent would then draw down from the fuel in the storage tanks the amount needed when needed to fuel Braniff aircraft. On this record, it is clear that the fueling agent abided Braniff's instructions in this regard.

The fact that the tanks contained fuel allocated to other airlines, by itself, is irrelevant to the "identification" and "possession and control" issue. The inquiry here deals solely with the fuel in the tanks allocated to Braniff. By focusing solely on the Braniff allocation, the court can ignore the fact that the tanks contained additional fuel allocated to others.

The fact that the fueling agent also served as fueling agent for other airlines and that other airlines controlled their allocable portion of the fuel in the tank farm storage tanks does not diminish the control Braniff exercised over its allocable portion. The point, of course, is that Braniff had the ability and authority to control the disposition of its fuel at the time the reclamation notice was received.

Thus, there is nothing about the pipeline and tank farm fuel delivery system that, by itself, prevents the identification of the fuel at issue or takes it out of Braniff's possession or control. In principle, therefore, Conoco can meet its identification and control burdens.

b. In what amount of fuel, if any, has Conoco established reclamation rights?

As described above, Conoco now asserts reclamation rights in only three fuel shipments. One of the shipments was made to Dallas–Fort Worth where Conoco is Braniff's only fuel supplier. The other two shipments were made to Kansas City where Conoco is one of four suppliers.

■ As to the Dallas–Fort Worth shipment, Conoco provided 100,002 gallons of fuel on September 26 representing a sales price, at 58.8 cents per gallon, of $58,801.17. Braniff's ending fuel inventory at Dallas–Fort Worth on September 29 was 133,550 gallons. Because the shipment at issue was the last shipment made at Dallas–Fort Worth, the court concludes that Braniff had on hand, at the time the reclamation demand was made, more than the full amount of the shipment and therefore could have returned it. Subject to adjustments to be discussed below, Conoco has established its reclamation right to this entire shipment.

The situation at Kansas City is more complex. At Kansas City, two shipments are in issue. The first shipment, represented by bill of lading number 81895, was partially paid by the credit balance then existing in the Braniff account when the shipment was received. In addition, Conoco is only one of four suppliers to Braniff there. Determining in what amount of fuel Conoco may have established reclamation rights is therefore more difficult than is the case at Dallas–Fort Worth.

The facts before the Court as to deliveries at Kansas City are these: Ten days before Conoco sent its reclamation demand, Braniff had on hand allocated to it some 691,912 gallons of fuel from all suppliers. Afterwards, on September 23 and 24, Braniff received 284,107 gallons of fuel for which it has not paid Conoco (63,060 unpaid gallons from the 120,485 received on September 23 under bill of lading number 81895, and 221,047 unpaid gallons received on September 24 under bill of lading number 81899). This amount represented a little more than half of the fuel delivered by

all four suppliers, including Conoco, during the ten-day period before the notice of reclamation was given. The deliveries of the unpaid Conoco fuel occurred in the middle of that ten-day period; it is unknown when during the ten-day period the other fuel supplied by the other three suppliers was delivered. On September 29, Braniff had on hand at Kansas City 397,735 gallons of fuel allocated to it.

On these facts, Conoco desires to reclaim the 284,107 gallons for which it is unpaid from the ending pool of 397,735 gallons. In effect, therefore, Conoco wants the court to assume that Braniff used during the ten-day reclamation period the fuel that it had on hand before the reclamation period began, the fuel that Conoco supplied during the reclamation period for which payment was made, *and* the fuel supplied by the other three suppliers during the reclamation period. In other words, Conoco says, only Conoco fuel for which payment had *not* been made was left in the tank at the end of the reclamation period, and Conoco can now reclaim this "identified" fuel.

Braniff, of course, contends just the opposite. Braniff would have the court assume that Braniff used during the ten-day reclamation period the Conoco fuel for which payment was *not* made so that the fuel remaining in the tank at the end of the period represents only fuel that was there before the reclamation period began, fuel supplied by Conoco for which payment *was* made during the reclamation period, and fuel supplied by the other suppliers. According to Braniff, this "identified" fuel remaining in the tank at the end of the period is therefore not subject to Conoco's reclamation.

█ The court concludes that it is required to reject both approaches. Where, as here, there are several suppliers delivering fungible, bulk goods into a common tank, an individual supplier must do more than merely trace its fungible, bulk goods into the pool and show that the pool contains only goods of like kind and grade. The supplier must go further and show what quantity of the goods was in the pool

at the beginning of the relevant reclamation period. The supplier must also show when, and how much of the goods, each of the suppliers contributed to the pool during that period. Finally, the supplier must show how much of the total remained in the pool at the end of the relevant period. With that information, the court can then determine the amount of each bulk shipment that was consumed (or sold) by the debtor during the period. The court can also determine to which supplier the amount remaining in the tank at the end of the period should be attributed or the proportional way in which the amount remaining should be allocated among the suppliers.

█ Implicit in the rule the court states here is a "first in, first out" theory of bulk fuel use that is to be applied in cases such as this where fungible, bulk goods are pooled or commingled. In other words, the first amounts delivered to the pool are the first amounts used; the last amounts delivered to the pool are the amounts remaining in the pool. This approach comports with common sense, is fair to all suppliers, is predictable and ascertainable, and avoids the possibility of inconsistent results that might occur in separate reclamation proceedings against a debtor by the different suppliers who contributed to the pool. Not only are the approaches suggested by Conoco and Braniff completely self-serving, each also guarantees that, if either were to be adopted, inconsistent results would occur in separate reclamation proceedings by the suppliers contributing to the pool.

█ As described above, Conoco bears the burden of proof as to each of the elements of its claim. *Rawson Food Service, supra* at 1347, 1348. The evidence here does not reflect when and in what amounts the deliveries from other suppliers were made during the ten-day reclamation period. The court is therefore unable to determine whose fuel remained in the tank at the end of the period or how much of the fuel that did remain can properly be attributed to Conoco. Because Conoco's proof fails on this critical point, the court must

reject Conoco's claim for reclamation with regard to the Kansas City shipments.

In conclusion, Conoco has established its right to reclaim only the 100,002 gallons of fuel delivered to Dallas–Fort Worth on September 26 under bill of lading number 22873.

### 3. *What is Conoco's remedy?*

At trial, it was established that Braniff later used all of the fuel at Kansas City and Dallas–Fort Worth that it had on hand on September 29, 1989, when Conoco's reclamation demand was made and received. Having determined that Conoco has established its reclamation rights to 100,002 gallons of fuel, what remedy is the court to provide in circumstances where Braniff no longer holds the fuel and cannot return it, either voluntarily or through judicial process?

Conoco argues that, if it can show it is entitled to reclaim fuel from Braniff, and assuming there is no fuel in Braniff's possession to satisfy Conoco's claim, then it must be granted an administrative claim *and* a lien on Braniff's assets as a cumulative alternative remedy. The court concludes that Conoco is entitled to one of these remedies but not both.

Section 546(c)(2) of the Bankruptcy Code provides:

(2) the court may deny reclamation to a seller with such a right of reclamation that has made such a demand only if the court—

(A) grants the claim of such a seller priority as a claim of a kind specified in section 503(b) of this title; *or*

(B) secures such claim by a lien. (Emphasis added)

Section 546(c)(2) is unambiguous in stating that a seller who has established a right to reclaim may be granted an administrative claim under Section 503(b) *or* a lien on the debtor's assets, not both. (*See Braniff, Inc. v. Toren (In re Braniff, Inc.*), 110 B.R. 980 (Bankr.M.D.Fla.1990) (where a statute is unambiguous on its face, no further inquiry is required). As one commentator has noted,

Section 546(c) is derived from Section 2–702 of the Uniform Commercial Code. It resolves conflicting decisions as to whether or not Section 2–702 is valid if bankruptcy intervenes. Under subsection (c) reclamation is permitted if a demand is made in writing before ten days after the receipt of the goods by an insolvent debtor. But the court may deny such right of reclamation if (A) the seller is granted a priority as an administrative expense, *or* (B) the claims secured by a lien. This provision protects a debtor seeking to reorganize by giving him use of the goods and at the same time protects the seller by giving him *either* an administration claim priority *or* a lien. (Emphasis added).

Bankruptcy Code § 546 comment (Collier Pamphlet ed. 1990); *See also* 4 King, Cook, D'Agostino & Klee, *Collier on Bankruptcy* ¶ 546.04, at 546–21–22 and n. 14 (15th ed. 1990).

In the case of *Griffin Retreading Co. v. Oliver Rubber Co. (Matter of Griffin Retreading Co.),* 795 F.2d 676 (8th Cir.1986), the seller established its right to reclaim goods under Section 546(c), but could not recover the goods because they had been sold by the debtor in the ordinary course of business. Because the goods had been sold, the district court denied the seller an alternative remedy under Section 546(c)(2)(A) or (B). The court of appeals reversed, holding that the district court should have considered the *alternative* remedies available to the seller. The court wrote:

Under § 546(c) (1982), while the reclaiming seller has the right (assuming the predicate conditions are met) to reclaim, the right is not an absolute one. If reclamation is denied the court must choose one of two alternatives. Under § 546(c)(2)(A) the court may treat the claim as an administrative expense priority under § 503(b), or under § 546(c)(2)(B) the court may secure such a claim by a lien. Such a lien is in the nature of a lien on the assets of the bankrupt estate, including the goods so delivered. *In re Coast Trading Co., Inc.,* 744 F.2d 686 at 692 [ (9th Cir.1984) ]; *In re Flagstaff*

*Foodservice Corp.,* 14 B.R. 462 at 467 [ (Bkrtcy.S.D.N.Y.1981) ].

*Id.* at 679.

■ The alternative nature of the remedies available under Section 546(c) has also been noted by other courts. *E.g., In re Roberts Hardware Co.,* 103 B.R. 396, 399 (Bankr.N.D.N.Y.1988); *Toshiba America, Inc. v. Video King of Illinois, Inc. (In re Video King of Illinois, Inc.),* 100 B.R. 1008, 1016 (Bankr. N.D. Ill.1989). Whether the court grants an administrative claim or a lien is within its sole discretion. 3A *Bender's U.C.C. Service, Duesenberg & King, Sales & Bulk Transfers,* § 13.03[4][e] at 13–71 (1989).

■ The court concludes that, in these circumstances, the appropriate remedy is an administrative expense claim of the kind specified in Section 503(b) of the Bankruptcy Code for several reasons. First, it is easy to administer. Second, it appears likely that all administrative expenses will be paid in this case. Third, the debtor has substantially no assets that are unencumbered. Providing a lien on assets to secure the claim might therefore be a meaningless remedy or at least be a remedy of substantially diminished value.

Although the court will allow this administrative expense claim, it will not at this time authorize the payment of the claim. The claim will be paid together with other administrative expenses in accordance with a plan of reorganization in the Chapter 11 case or otherwise upon further order of the Court.

■ Having concluded that an administrative claim is Conoco's remedy in these circumstances, what is the amount of the claim? In *Video King,* 100 B.R. at 1016, the court noted that, once a right to reclamation is established by the seller, then the seller must establish the dollar value of that right in order for the court to determine the amount of the lien or administrative expense allowed. This dollar value may be determined on the basis of the invoice price of the goods. *In re Flagstaff Foodservice Corp., supra,* 56 B.R. at 914 n. 9.

Here Conoco has established that the invoice amount for the fuel it is entitled to reclaim (bill of lading number 22873) is $58,801.17. This represents a portion of the $243,070.49 shown as the balance due Conoco on the summary of shipments made to Braniff (plaintiff's exhibit 41) excerpted above. To that total amount, Conoco later made month end adjustments, not relevant here, of $46,741.63 to reach the current balance due Conoco from Braniff on these shipments of $196,328.86. Braniff is therefore entitled to a portion of this credit as a credit against the $58,801.17 invoice amount. These month end adjustments represent 19.23 percent of the $243,070.49 total invoice amount. Accordingly, Braniff is entitled to a 19.23 percent credit on the Dallas–Fort Worth shipment that Conoco is entitled to reclaim, or $11,307.46. After applying that credit to the invoice amount, the value of the fuel for which Conoco has established its reclamation rights is $47,-493.71. This is the amount of Conoco's administrative claim.

### Conclusion

Pursuant to Bankruptcy Rule 9021, the court will enter in the adversary proceeding a separate judgment based upon the decision contained in this memorandum opinion. Likewise, the court will enter in the main Chapter 11 case a separate order denying as moot the motion to lift the stay.

DONE and ORDERED.