**In re GRAPHIC PRODUCTIONS CORPORATION, Jets Management Corp. and Graphic Productions Corporation—New York Division, f/k/a Catalogs by Formula One, Inc., Debtors.**

**GRAPHIC PRODUCTIONS CORPORATION, Jets Management Corp. and Graphic Productions Corporation—New York Division, f/k/a Catalogs by Formula One, Inc., Plaintiffs,**

v.

**WWF PAPER CORPORATION and WWF Paper Corporation— Florida, Defendants.**

Bankruptcy Nos. 93–12771–BKC– AJC to 93–12773–BKC–AJC. Adv. No. 94–0453–BKC–AJC–A.

United States Bankruptcy Court, S.D. Florida, Miami Division.

Dec. 13, 1994.

Raymond R. Magley, Smith Hulsey & Busey, Jacksonville, FL, for WWF Paper Corp.

Harold D. Moorefield, Jr., Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Miami, FL, for Graphic Productions Corp.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

A. JAY CRISTOL, Chief Judge.

This adversary proceeding seeking to avoid prepetition transfers as preferences came before the Court for a trial on September 21, 1994. Upon the evidence presented, the Court enters the following findings of fact and conclusions of law:

### Findings of Fact

Plaintiff, Graphic Productions Corporation ("GPC"), is seeking to avoid two prepetition transfers made to WWF Paper Corporation ("WWF"). The first is a payment of $149,-554.53 made by GPC to WWF for the sale of paper and the second is the return of six truckloads of paper by GPC to WWF. WWF contends, among other things, that (i) the transfers were made in the ordinary course of business pursuant to § 547(c)(2) of the Bankruptcy Code and (ii) the paper returned to WWF was reclaimed so that, pur-suant to § 546(c), the debtor cannot avoid the transfer as a preference.

### A. The $149,558.53 Payment

At the time the transfers occurred, Miami Paper was a division of WWF. Miami Paper was a wholesale distributor of joblot and excess tonnage paper.[1] GPC was a mid-size printer.

For several years prior to the petition date, Miami Paper sold joblot and excess tonnage paper to GPC on a regular basis.

The President of Miami Paper, Al Kaplan, who was responsible for WWF's account with GPC, testified that the payment terms between GPC and WWF were 60 days from the invoice date but that GPC usually paid WWF several weeks after the 60 day period expired. GPC's president, Pete Pizarro, confirmed that GPC typically paid WWF 90 days from the invoice date.

During the two years preceding GPC's Chapter 11 petition, WWF and GPC engaged in 20 transactions. Those transactions are summarized as follows:

| Invoice # | Invoice Date | Invoice Amount | Date Pmts Received | Amount Paid | Days Between Invoice Date and Date Payments Received |
|---|---|---|---|---|---|
| 153456 | 07/16/91 | $ 709.80 | 09/26/91 | $ 709.80 | 72 |
| 154081 | 07/17/91 | 392.00 | 09/26/91 | 392.00 | 71 |
| 154369 | 07/18/91 | 804.44 | 09/26/91 | 804.44 | 70 |
| 155988 | 07/23/91 | 920.70 | 09/26/91 | 920.70 | 65 |
| 156141 | 07/24/91 | 770.40 | 09/26/91 | 770.40 | 64 |
| 159406 | 08/02/91 | 3,665.20 | 10/23/91 | 3,665.20 | 82 |
| 171173 | 09/09/91 | 36,967.78 | 11/20/91 | 36,967.78 | 72 |
| 171192 | 10/04/91 | 37,832.90 | 12/11/91 | 37,832.90 | 68 |
| 178312 | 10/14/91 | 37,227.56* | 12/18/91 | 33,875.58 | 65 |
| | 10/14/91 | | 10/06/92 | 3,351.98 | (358) |
| 199103 | 11/29/91 | 70,206.68* | 01/17/92 | 35,206.68 | (49) |
| | 11/29/91 | | 02/06/92 | 35,000.00 | 69 |
| 189968 | 02/03/92 | 72,659.04* | 05/15/92 | 69,814.12 | 102 |
| | 02/03/92 | | 10/06/92 | 2,626.24 | (246) |
| 216954 | 03/19/92 | 89,717.61 | 06/30/92 | 89,717.61 | 103 |
| 237724 | 06/03/92 | 90,289.90* | 08/14/92 | 45,000.00 | (72) |
| | 06/03/92 | | 08/31/92 | 45,289.90 | 89 |
| 275898 | 07/24/92 | 34,424.25 | 10/16/92 | 34,424.25 | 84 |
| 280026 | 08/06/92 | 19,351.44 | 11/24/92 | 19,351.44 | 110 |
| 233518 | 08/19/92 | 19,477.92 | 11/24/92 | 19,477.92 | 97 |
| 287821 | 09/03/92 | 19,857.36* | 12/30/92 | 10,000.00 | (118) |
| | 09/03/92 | | 01/29/93 | 9,857.36 | 148 |

1. Joblot paper is paper which WWF's suppliers do not sell in the normal channels of distribution. Excess tonnage paper is paper which WWF's suppliers have an over abundance of. Joblot and excess tonnage paper is usually sold at a lower price than first line paper.

| Invoice # | Invoice Date | Invoice Amount | Date Pmts Received | Amount Paid | Days Between Invoice Date and Date Payments Received |
|---|---|---|---|---|---|
| 293141 | 09/22/92 | 19,686.61 | 01/29/93 | 19,686.61 | 129 |
| 354495 | 03/19/93 | 74,720.53 | 06/11/93 | 74,720.53 | 84 |
| 354498 | 03/19/93 | 74,834.00 | 06/11/93 | 74,834.00 | 84 |

\* denotes multiple payments on one invoice [2]

The alleged preferential payment of $149,554.53 was made on June 8, 1993 and received by WWF on June 11 which is 84 days after the invoice date of March 19, 1993. This payment was not made in response to any collection procedures by WWF.

### B. *Return of the Paper*

On April 8, 1993, GPC ordered 14 truckloads of paper from WWF. Six truckloads were actually delivered by WWF to GPC. Two truckloads were delivered on June 8, 1993. Two truckloads were delivered on June 9, 1993. Two truckloads were delivered on June 10, 1993 (collectively, the "Paper").

On or about the time the Paper was delivered, GPC's purchasing agent, Carol Alvarado, telephoned Don Palmer, WWF's Vice President, and asked him to cancel all outstanding purchase orders. Mr. Palmer testified that Ms. Alvarado told him that the orders were being canceled because GPC did not need this Paper and would not be using this quality of paper anymore. On the next day, Mr. Kaplan telephoned Ms. Alvarado and asked her why the purchase orders were canceled. Ms. Alvarado did not confirm that the purchase orders were canceled and did not discuss the return of the Paper which GPC had just received.

On June 12, 1993, GPC sold its stock to Penta Management Group, Inc. ("Penta"). Pete Pizarro, the current president of GPC, was the president of Penta at the time of the sale. Noel Hernandez was the principal shareholder of GPC before the stock sale. Mr. Hernandez personally guaranteed payment of all paper delivered by WWF to GPC. As part of the stock·sale, Penta agreed to indemnify Mr. Hernandez for any payments he made on his personal guarantee if GPC filed bankruptcy.

On June 16, 1993, Mr. Hernandez sent a letter to Mr. Kaplan requesting that his personal guarantee be revoked. On the next day, WWF's Credit Manager, Doug Powell, sent a letter to Mr. Hernandez refusing to revoke the personal guarantee until the Paper was paid for.

On June 18, 1993, Ms. Alvarado telephoned Mr. Kaplan and informed him that GPC had moved the Paper to Security Bonded Warehouse and would return the Paper to WWF if Mr. Kaplan wrote her a letter demanding return of the paper and stating that WWF would pay the storage and transportation charges.[3] In accordance with Ms. Alvarado's instruction, on that same day, Mr. Kaplan sent a letter by facsimile to Ms. Alvarado requesting that the Paper be transferred to WWF and stating that WWF would pay the transportation and storage charges. On June 21, 1993, GPC returned the Paper to WWF. On June 22, 1993, Mr. Pizarro informed Mr. Kaplan for the first time that GPC's stock had been sold.

### Conclusions of Law

#### A. *The $149,554.53 Payment*

1. *The $149,554.53 payment was made in the ordinary course of business under § 547(c)(2) of the Bankruptcy Code.*

Section 547(c)(2) provides that a transfer will not be avoided if it was (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs ·of the debtor and the transferee; (B) made in the

---

2. The average days between the invoice date and the date payment was received was 86.4. Five of the invoices were paid with two payments. The payments in parenthesis are not included in the Court's calculations.

3. During this telephone conversation, Ms. Alvarado did not inform Mr. Kaplan of the stock sale or that Mr. Hernandez had sold his stock to Penta or that GPC was having financial problems.

ordinary course of business or financial affairs of the debtor and the transferee; and, (C) made according to ordinary business terms. 11 U.S.C. § 547(c)(2) (1984); *In re Craig Oil Company*, 785 F.2d 1563, 1564–65 (11th Cir.1986).

The transferee has the burden of proof to establish the applicability of § 547(c)(2). *In re Mastercraft Graphics, Inc.*, 157 B.R. 914, 918 (Bankr.S.D.Fla.1993).

In describing § 547(c)(2), Congress stated that

> [Its purpose] is to leave undisturbed normal financial relations, because [such an exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditor during the debtor's slide into bankruptcy.
>
> H.R.Rep. No. 595, 95th Cong. 1st Session, 373–74 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 6329.

In commenting on this legislative history, the United States Court of Appeals for the Eleventh Circuit in *Craig Oil* stated:

> It seems clear from this statement that § 547(c)(2) should protect those payments which do not result from "unusual" debt collection or payment practices. To the extent an otherwise "normal" payment occurs in response to such practices, it is without the scope of § 547(c)(2). Thus, whenever the bankruptcy court receives evidence of unusual collection efforts, it must consider whether the debtor's payment was in fact a response to those efforts.
>
> *In re Craig Oil Company*, 785 F.2d at 1566.

The issue under § 547(c)(2) is whether the transfer in question was made in a similar manner to the parties' transactions prior to the preference period. *Matter of*

*Brown Transport Truckload, Inc.*, 161 B.R. 735 (Bankr.M.D.Ga.1993).

Late payments can fall within the ordinary course of business exception if the prior course of conduct between the parties demonstrates that those types of payments were ordinarily made late. See, *In re Grand Chevrolet, Inc.*, 25 F.3d 728 (9th Cir.1994); *Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029, 1032 (7th Cir.1993); *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir.1991); *In re Yurika Foods Corp.*, 888 F.2d 42, 44–45 (6th Cir.1989); *In re Jerry–Sue Fashions, Inc.*, 91 B.R. 1006, 1008 (Bankr.S.D.Fla.1988).

Applying this law, the Court finds that the $149,554.53 payment was made in the ordinary course of business between WWF and GPC because it was consistent with their prior course of dealing. GPC's payments to WWF were ordinarily made late. During the two years prior to the petition date, GPC and WWF engaged in 20 transactions. GPC's payments ranged between 64 and 148 days from the invoice date. During this time, the average payment was made 86 days from the invoice date. Even though the terms between the parties were 60 days, WWF never received a full payment within the 60 day time period. GPC's president, Pete Pizarro, admitted that GPC typically paid WWF 90 days from the invoice date. The $149,554.53 payment was received by WWF 84 days from the invoice date.

Furthermore, GPC's $149,554.53 payment did not result from unusual debt collection or payment practices. WWF took basically no action to collect the payment. There was no change in the form or method of payment. WWF did not threaten to limit GPC's credit or refuse to deliver new merchandise to GPC unless GPC made the payment.[4] GPC has continued in business so the payment was not made after a cease of business operations. At the time the payment was made, WWF

---

4. In fact, two new truckloads of paper were delivered by WWF to GPC on June 8, 1993, the date the $149,554.53 check was delivered and three days before it was received by WWF's home office in Pennsylvania. Furthermore, even if WWF reduced GPC's credit limit, it is not enough to take the payment outside § 547(c)(2). *See, Matter of Brown Transport Truckload, Inc.*, 161 B.R. at 740.

> Simple changes in the amount of credit that a creditor is willing to extend a debtor, and changes in method of payment by a debtor to a creditor are not enough to make the business relationship not ordinary. More drastic changes must be effected before payments are considered not to be ordinary.
>
> *Id.* at 740.

did not know that GPC was having financial problems.

■ GPC contends that the $149,554.53 payment was not in the ordinary course of business between the parties because it was made only to release Mr. Hernandez' personal liability under his guarantee. There is no direct evidence that this was the reason for the payment. Mr. Hernandez did not testify at trial. Even if the payment was made for this reason, it only shows GPC's motive for making the payment. A debtor's motive for making a payment or state of mind cannot alone establish "unusual" or "extraordinary" actions by the debtor. It merely goes to explain unusual payment actions by the debtor. *See, In re Craig Oil Company,* 785 F.2d at 1566. Since GPC's $149,554.53 payment was not unusual, GPC's motive for making the payment alone does not take the payment outside § 547(c)(2). Finally, Mr. Hernandez' personal guarantee was given in the ordinary course of business between the parties. Mr. Hernandez provided WWF with a personal guarantee during the time that the parties engaged in business. A personal guarantee is not unusual in the industry. Mr. Hernandez had given personal guarantees to several other suppliers of GPC and Mr. Kaplan testified that he often requested personal guarantees from WWF's customers.

2. *Section 547(c)(2)(C) does not require compliance with terms ordinary in the industry.*

■ GPC contends that the $149,554.53 payment does not fall within § 547(c)(2) because it was not made according to terms ordinary in the industry. The Court finds that in determining whether the ordinary course of business exception applies, the inquiry must be directed to an analysis of the business practices which were unique to the particular parties involved and not to generally prevailing industry practices. *In re Fulghum Construction Corp.,* 872 F.2d 739, 743 (6th Cir.1989); *In re Equipment Company of America,* 135 B.R. 169, 173 (Bankr. S.D.Fla.1991); *In re Industrial Supply Corp.,* 127 B.R. 62, 64–65 (M.D.Fla.1991).

In *Equipment Company of America,* the bankruptcy court for this district held, in reliance upon the Eleventh Circuit Court of Appeals' decision in *Craig Oil,* that the focus is on the ordinary business terms between the parties and not of the industry.

In *Southern Commodity,* the court required that payments be made according to terms ordinary in the industry. However, reading 11 U.S.C. § 547(c)(2)(C) as requiring compliance with the terms ordinary in the industry would negate any benefit the exception would convey. That reading would require that the parties conduct themselves according to business norms, restricting their chosen course of dealing to an industry standard. The exception was created to allow debtors and creditors to continue in their normal course of business, and "discourage unusual action by either the debtor or his creditor during the debtor's slide into bankruptcy." *In re Craig Oil Company,* 785 F.2d 1563, 1566 (11th Cir.1986). To hold otherwise would be to place the exception out of reach of all those debtors and creditors for whom it was written.

*Id.* at 173.

Other courts have stated that the Eleventh Circuit Court of Appeals in *Craig Oil* apparently did not require compliance with terms ordinary in the industry. *See, In re U.S.A. Inns. of Eureka Springs, Arkansas, Inc.,* 9 F.3d 680, 684 (in *Craig Oil,* the court discussed "ordinary course of business" and "according to ordinary business terms" as though they might be satisfied by the same standard); *see also, In re Fulghum Construction Corp.,* 872 F.2d at 743; *Matter of Tolona Pizza Products Corp.,* 3 F.3d at 1031.

Based upon the foregoing, the Court finds that § 547(c)(2)(C) does not require compliance with terms ordinary in the industry.

3. *Even if § 547(c)(2)(C) requires compliance with terms ordinary in the industry, the $149,554.53 payment was made in accordance with the industry standard.*

■ WWF's expert witness, Sharron Hollander, testified that the standard payment terms in the industry for the sale of large quantities of joblot or excess tonnage paper to a mid-size printer is no less than 60 days from the invoice date. She also testified that even if the stated terms are 60 days, it is

industry standard that the seller of large quantities of joblot or excess tonnage paper normally does not get paid, and does not expect payment, until approximately 75 to 90 days from the invoice date. Mr. Kaplan, who has 40 years of experience in the paper industry, also testified that a seller of joblot or excess tonnage paper typically gets paid within 60 to 90 days from the invoice date because of the higher profit margins the seller receives for joblot or excess tonnage paper.[5]

The defendants' expert witness, Peter Garberding, testified that the standard payment terms in the industry are net 30 days and a 2% discount for payment within 10 days. Mr. Garberding worked as a credit manager in the paper industry for 5½ years. He worked for two companies which sold mostly first line paper as opposed to joblot or excess tonnage paper. He worked for over five years at Butler Paper. Only 10% of Butler's business is selling excess tonnage paper. Mr. Kaplan and Ms. Hollander testified that the payment terms for a first line paper merchant and a joblot or excess tonnage paper merchant are different. The payment terms for the first line paper merchant are usually less.

Based upon the foregoing, the Court finds that even if industry standard is relevant, the $149,554.53 payment which was made 81 days and received 84 days from the invoice date was in accordance with the industry standard of 60 to 90 days from the invoice date.

 4. *Even if the industry standard for payment terms is less than 60 to 90 days, the $149,554.53 payment was still made in accordance with ordinary business terms.*

■ Section 547(c)(2)(C) does not require a creditor to establish the existence of some uniform set of business terms. It requires evidence of a prevailing practice among similarly situated members of the industry facing the same or similar problems. The focus of § 547(c)(2)(C) should be on whether the terms between the parties were particularly unusual in the relevant industry. *In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.,* 9 F.3d at 685–86; *Matter of Tolona Pizza Products Corp.,* 3 F.3d at 1032–34.

We conclude that "ordinary business terms" refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.

 *Matter of Tolona Pizza Products Corp.,* 3 F.3d at 1033.

■ Applying this law, the Court finds that the circumstances surrounding the $149,554.53 payment were not "particularly unusual in the industry" and were not so "idiosyncratic" or "extraordinary" as to fall outside the broad scope of § 547(c)(2)(C). Even if the payment was late, a similarly situated member of the industry would have accepted the late payment, as WWF did, without instituting collection procedures. WWF's expert witness testified that WWF acted consistent with the industry practice by accepting the payment without taking any collection action. Even GPC's expert witness testified that he would accept a payment which is 20 days late. The only collection action he would take to that point would be a phone call requesting payment and stopping future deliveries until the payment is made.

Accordingly, WWF acted consistent with the industry standard by working with GPC and accepting the payment even though it was past the stated invoice terms.

 B. *GPC's Return of the Paper to WWF*

 1. *GPC's return of the Paper to WWF is not a preference pursuant to § 546(c) of the Bankruptcy Code because WWF reclaimed the Paper.*

Section 546(c) of the Bankruptcy Code provides as follows:

 (C) Except as provided in subsection (d) of this section, the rights and powers of a trustee under Sections 544(a), 545, 547 and 549 of this title are subject to any statutory or common law right of a seller of goods

---

**5.** GPC's payments to its suppliers is consistent with Ms. Hollander's and Mr. Kaplan's testimony. Mr. Pizarro testified that GPC typically paid its suppliers 50 to 90 days from the invoice date.

that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, but—

(1) such a seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods before 10 days after receipt of such goods by the debtor ...

■ In order to establish entitlement to reclamation from a debtor under § 546(c) and § 672.702(2), *Florida Statutes,* a seller must satisfy the following four-part test:

1. The debtor was insolvent at the time the goods were delivered by the seller;

2. a written demand was made on the debtor within 10 days after the goods were delivered to the debtor;

3. the goods were identifiable at the time the demand was made; and

4. the goods were in the possession and control of the debtor at the time the demand was made.

*In re Braniff, Inc.,* 113 B.R. 745, 751 (Bankr.M.D.Fla.1990).

■ The Court finds that elements 1, 3 and 4 have been satisfied. GPC was insolvent at the time the Paper was returned to WWF.[6] The Paper was identifiable at the time GPC received the written demand from WWF. The Paper was in GPC's possession and control at the time the demand was made.[7] The sole remaining issue is whether WWF made a written demand on GPC within 10 days after the goods were delivered to GPC.

Section 546(c) does not contain specific requirements for what must be in a written demand other than the requirement that the demand be in writing. Section 671.201(26), *Florida Statutes,* provides that

A person "notifies" or "gives" notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it.

■ This provision requires that the person giving the notice take such steps as may be reasonably required to inform the other. This section does not require that the notice state the provision of the UCC upon which the seller is relying. The notice, in the case of reclamation, is sufficient if it reflects an intention on the part of the seller to rescind the sale. *In re Summit Creek Plywood Company, Inc.,* 27 B.R. 209, 214 (Bankr. D.Ore.1982). *See also, In re Alla–Ohio Valley Coals, Inc.,* 22 B.R. 336 (Bankr.D.Col. 1982) (§ 546(c) does not require anything other than a demand in writing which is reasonably susceptible to conveying the seller's intention. A notice of appeal of a court order requiring the creditor to deliver product to the debtor which ... "makes no mention of any demand for reclamation" satisfies this requirement).

Applying this law, the Court finds that the letter sent by Mr. Kaplan to Ms. Alvarado on June 18, 1993, satisfies the requirements of § 546(c) because it conveys an intention to rescind the sale of the Paper. The letter requests that the Paper be transferred to WWF. Moreover, it is undisputed that the letter was a written demand for return of the Paper. Ms. Alvarado and GPC's president, Mr. Pizarro, testified that the letter was a written demand for return of the Paper. Ms. Alvarado further testified that Mr. Pizarro decided to return the Paper only after he saw the letter. Mr. Kaplan confirmed Ms. Alvarado and Mr. Pizarro's testimony. He testified that Ms. Alvarado requested that he send her a written demand for return of the goods and that the June 18 letter was that written demand. He also testified that she told him that GPC would return the Paper only after she got the written demand.

GPC argues that the June 18 letter is not a written demand for reclamation because it does not contain the word "reclamation" or a reference to § 546(c) or § 672.702, *Florida Statutes.* The Court rejects this argument. The Court finds that under these circumstances, WWF was not required to use the

---

6. In addition, at the time the written demand was sent, Mr. Kaplan believed that GPC was having financial difficulties.

7. Even though the Paper was being held by Security Bonded Warehouse at the time the Paper was sent, GPC still owned and controlled the Paper.

word "reclamation" in its written demand. The letter conveyed an intention to rescind the sale and return the Paper. Both parties agree that the letter was a written demand for return of the Paper. Moreover, § 546(c) does not specifically require the use of the word "reclamation" in the written demand. Words synonymous with reclamation which convey an intention to rescind the sale or return of the goods are sufficient. To hold otherwise would deny reclamation to a merchant who has no knowledge of § 546(c) but who otherwise complied with it by demanding in writing return of goods within the 10 day period. In fact, "reclaim" means "to claim or demand back; to ask for the return or restoration of a thing." Henry Campbell Black, *Blacks Law Dictionary*, (5th Ed.1979). Both parties agree that the letter conveyed an intention to "demand back" the Paper and "ask[ed] for the return" of the Paper.

The Court finds that the written demand was made within 10 days after the Paper was delivered to GPC because the demand was made by WWF on June 18, 1993. The Paper was received on June 8, 9 and 10. *See, In re Braniff, Inc., supra* (a written demand made on September 29, 1989 applied to product delivered on September 19, 1989); *In re Flagstaff Food Service Corp.*, 56 B.R. 899, 907, n. 6 (Bankr.S.D.N.Y.1986) (a written demand made on July 24 applied to goods received on July 14); *In re Landy Beef Company, Inc.*, 30 B.R. 19 (Bankr.D.Mass. 1983) (a written demand made on April 4, 1980 applied to goods shipped on March 25, 1980).

2. *GPC's return of the Paper to WWF was made in the ordinary course of business pursuant to § 547(c)(2).*

■■■■ While § 547(c)(2) requires the transfer to be made in the "ordinary course of business", it does not require the transfer to be common. An extensive showing that the transaction occurred often, or even regularly, is not necessary. A transaction can be ordinary and still occur only occasionally. Similarly, the transaction does not have to be of the type in which the parties were most often involved. The term ordinary contemplates at least in part, "that which is ordinary between the respective parties." The Court need not, however, rely solely upon the previous transactions between the parties, but also may look to similar transactions between either of the parties and third persons in determining whether the transfer was "ordinary". *In re Energy Co-op, Inc.*, 103 B.R. 171, 176 (N.D.Ill.1986); *see also, Windsor Communications Group*, 63 B.R. 770, 774–75 (E.D.Pa.1986).

■■■■ Applying this law, a return of paper was ordinary between GPC and WWF and also in the industry. Mr. Kaplan testified that GPC returned paper to WWF on several occasions and WWF always accepted it back. Ms. Hollander, WWF's expert witness, also testified that it is ordinary in the industry for a buyer to return paper and a seller to accept it back. GPC's shipping and receiving manager, Terry Gelfand, who is in charge of receiving and shipping paper for GPC, testified that GPC occasionally returned paper to their suppliers for various reasons including cancellations by customers and GPC having too much paper on hand. He also testified that GPC's suppliers always accepted the paper back.

Furthermore, the return of the paper was not in response to any unusual collection procedures by WWF. GPC returned the Paper because it did not want it. GPC received the paper on June 8, 9 and 10, 1993. Four days later, on June 14 and 15, 1994, GPC moved the paper to a security bonded warehouse because it did not want it. On June 18, 1993, GPC informed WWF that it would return the Paper to WWF if WWF sent a written demand requesting return of the Paper and stating that it would pay the storage and transportation charges.

GPC contends that the return of the Paper was not in the ordinary course of business because it was returned only to release Mr. Hernandez of his liability under the personal guarantee which would have released Penta's liability under its indemnification agreement to Mr. Hernandez. However, because Mr. Hernandez did not testify, there is no direct evidence that this was the reason for GPC's return of the Paper. The only direct evidence of the reason for GPC's return of the

Paper is Mr. Palmer's testimony that Ms. Alvarado told him she was canceling the orders because GPC had too much paper and would not be using that quality of paper anymore. Furthermore, Penta was only liable under the indemnification agreement if GPC filed bankruptcy. Mr. Pizarro testified that at the time the Paper was returned, GPC had not yet determined that it would file under Chapter 11. Mr. Hernandez probably requested a release of his guarantee, not because he feared Penta's liability under the indemnification agreement, but rather because he no longer owned GPC. Finally, even if the Paper was returned for the sole purpose of releasing Mr. Hernandez' liability under the guarantee, it only shows GPC's motive for returning the Paper which cannot alone establish "unusual" or "extraordinary" actions by the debtor. *See In re Craig Oil*, 785 F.2d at 1566.[8]

C. *If the return of the Paper is avoided as a preference, then the $149,554.53 payment is not avoidable pursuant to § 547(c)(4) to the extent of the value of the Paper returned.*

 Section 547(c)(4) provides that a transfer cannot be avoided to the extent that it was:

(4) to or for the benefit of a creditor, to the extent that after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

The $149,554.53 payment was delivered to WWF on June 8, 1993.[9] After the payment was made, WWF delivered the Paper to GPC on June 8, 9 and 10, 1993. If the return of the Paper is avoidable as a preference and WWF is required to return the Paper to GPC or pay the value of it, then the delivery of the Paper by WWF to GPC on June 8, 9 and 10 is new value given by WWF to GPC after the $149,554.53 payment. This new value was not secured by an otherwise unavoidable security interest and, on account of this new value, GPC did not make an otherwise unavoidable transfer to or for the benefit of GPC.

A final judgment will be entered in accordance with these Findings of Fact and Conclusions of Law.

**DONE AND ORDERED.**

### *JUDGMENT*

This case came on for trial on September 21, 1994, before the Court upon the plaintiffs', Graphic Productions Corporation, Jets Management Corp. and Graphic Productions Corporation—New York Division, f/k/a Catalogs by Formula One, Inc., complaint to avoid two alleged preferential transfers. The Court having heard testimony, taken evidence and considered the argument of counsel, and having entered its findings of fact and conclusions of law, it is

ORDERED and ADJUDGED that judgment is entered in favor of the defendants, WWF Paper Corporation and WWF Paper Corporation–Florida, and against plaintiffs on all counts of the complaint.

**DONE AND ORDERED.**

---

8. GPC relies upon *In re Martin County Custom Pools, Inc.,* 37 B.R. 52 (Bankr.S.D.Fla.1984) in which this district held that § 547(c)(2) does not include the return of inventory to a supplier by the debtor that has suspended its business. This case is distinguishable because GPC had not suspended or ceased its business and the evidence shows that a return of paper was ordinary between GPC and WWF and in the industry.

9. For the purpose of calculating new value under § 547(c)(4), a transfer occurs when a check is delivered. *In re Kroh Brothers Development Company,* 930 F.2d 648 (8th Cir.1991); *In re Ladera Heights Community Hospital, Inc.,* 152 B.R. 964 (Bankr.C.D.Cal.1993).